IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : Civil Action No. 1:21-CV-05502 <br> : <br> INTERNATIONAL ASSOCIATION OF SHEET : <br> METAL, AIR, RAIL AND TRANSPORTATION : <br> WORKERS – TRANSPORTATION DIVISION : <br> *et al.* : <br> : <br> Defendants. : | |

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

Union Pacific Railroad Company's ("Union Pacific") files this motion for summary judgment to enforce the mandatory dispute resolution procedures of the Railway Labor Act, 45 U.S.C. § 151, et seq. ("RLA"). The disputes described herein arise out of union protests against Union Pacific's legally required implementation of the federal mandate requiring vaccination of employees of federal contractors and subcontractors ("the Mandate"). Because of the imminent deadlines established by the Mandate, Union Pacific requests expedited treatment of this motion.

On September 9, 2021, President Biden issued Executive Order No. 14042, titled "Ensuring Adequate Safety Protocols for Federal Contractors" directing the President's Safer Federal Workforce Task Force ("Task Force") to promulgate guidance requiring all federal contractors and subcontractors to "provide adequate COVID-19 safeguards" for their employees. *See* 86 Fed. Reg. 50985 (Sept. 14, 2021). On September 24, 2021, the Task Force issued the requisite guidance, which as approved by the Director of the Office of Management and Budget,

requires all employees of federal contractors and certain subcontractors (with limited exceptions not applicable here) to be fully vaccinated against COVID-19 no later than December 8, 2021. *See* 86 Fed. Reg. 53691 (Sept. 28, 2021).

Union Pacific is a federal contractor and subcontractor subject to the requirements of the Mandate. On October 11, 2021, Union Pacific notified its employees that it would comply with the Mandate. Union Pacific's status as a federal contractor has not been challenged by any of the Defendant Unions. In any event, Union's Pacific's status as a federal contractor is confirmed by the Declaration of Jacqueline Bendon, which is submitted herewith as Exhibit 5 to Plaintiff's Statement of Material Facts.

The Defendant Unions in this case – the International Association of Sheet Metal, Air, Rail and Transportation Workers – Transportation Division ("SMART-TD"), the Brotherhood of Locomotive Engineers and Trainmen ("BLET") and the Brotherhood of Maintenance of Way Employees Division/IBT ("BMWED") – have raised objections to Union Pacific's compliance with the Mandate itself. They have also objected to certain actions Union Pacific has taken to comply with the Mandate and to encourage compliance by its employees. Finally, the Defendant Unions have also demanded additional pay or other benefits in connection with implementation of the Mandate.

As we demonstrate in this brief, the Unions' objection to Union Pacific's compliance with the Mandate itself is without merit as a matter of law. Furthermore, the Unions must follow the mandatory dispute resolution procedures of the RLA to resolve any dispute over (1) Union Pacific's method of implementing the Mandate and (2) any demands for additional compensation or other benefits.

*First*, as a government contractor, Union Pacific has no choice but to comply with the Mandate. The Unions' objection to Union Pacific's compliance with an enforceable government mandate is without merit as a matter of law. Moreover, while Union Pacific recognizes that it has an obligation to bargain over the effects of its compliance with the Mandate, and is complying with that obligation, the RLA does not require Union Pacific to delay complying with the Mandate pending completion of any effects bargaining. *Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Execs.' Ass'n*, 491 U.S. 490, 503-504 (1989) ("*Pittsburgh & Lake Erie*").

*Second*, any disputes over actions taken by Union Pacific in connection with its compliance with the Mandate, including the plan to disqualify employees who refuse to be fully vaccinated by December 8, 2021 as required by the Mandate, the offer of incentive payments to employees to encourage compliance with the Mandate, and Union Pacific's continuation of pay for vaccinated employees who experience breakthrough infections as a result of workplace exposures are all "minor disputes" that must be resolved exclusively through binding arbitration under Section 3 of the RLA, 45 U.S.C. § 153. The disputes arise out of the interpretation or application of existing collective bargaining agreements, including terms implied therein by practice and managerial prerogative, and Union Pacific's position with respect to the merits of those disputes is not "frivolous or obviously insubstantial." Accordingly, such disputes must be resolved in arbitration. *Consolidated Rail Corp. v. Railway Labor Execs.' Ass'n*, 491 U.S. 299, 303 (1989) ("*Conrail*"); *Brotherhood of Loc. Eng'rs and Trainmen v. Union Pacific R.R. Co.*, 879 F.3d 754, 756, 758 (7th Cir. 2017) ("*BLET v. UP*").

*Third*, any union demands for additional pay or other benefits in connection with Mandate necessarily require changes to existing collective bargaining agreements. As to such demands, the Unions are required to follow the RLA's mandatory collective bargaining procedures. Under the

3

RLA, disputes over proposals to change existing agreements are known as "major disputes." Such disputes are subject to the RLA's mandatory processes of negotiation, mediation and, where ordered by the President, Emergency Board proceedings. Unions are prohibited from engaging in strikes or other forms of self-help over such disputes during the major dispute process. Union Pacific and the Defendant Unions are already engaged in negotiations over proposed changes to their existing collective bargaining agreements. Any union demands for changes to those agreements in connection with the Mandate must be made through the RLA's mandatory major dispute resolution procedure.

## II.    STATEMENT OF MATERIAL FACTS

Union Pacific incorporates the Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment filed herewith.

## III.   ARGUMENT

### A.    Union Pacific Is Not Required To Bargain Over Its Compliance With The Federal Contractor Vaccine Mandate.

Union Pacific is a government contractor subject to the requirements of the Mandate. (Stmt. of Mat. Facts ¶¶14-17). The Defendant Unions do not contend otherwise. Neither the correspondence sent to Union Pacific nor the lawsuits filed by Defendants protesting Union Pacific's compliance with the Mandate include any allegation that Union Pacific is ***not*** subject to the requirements of the Mandate. Nor could there be. Union Pacific has long been engaged in the transportation of freight for numerous federal government agencies, including particularly, the Department of Defense. Thus, the requirement for employees of federal contractors and subcontractors to become fully vaccinated by December 8, 2021 unquestionably applies to Union Pacific's employees, including the employees represented by SMART-TD, BLET and BMWED,

all of whom play an integral role in ensuring the safe and efficient movement of freight over the Union Pacific system.

The Courts have long recognized that an employer and union "cannot agree to terms in a labor contract which violate separate federal statutes or regulations." *EEOC v. County of Calumet*, 686 F.2d 1249, 1255 (7th Cir. 1982). In that regard, the Supreme Court has explained, "The terms of any collective bargaining agreement must comply with federal laws that prohibit discrimination on grounds of race, color, religion, sex, or national origin; that protect veterans; that regulate certain industries; and that preserve our competitive economy." *United Mine Workers of Amer. Health and Ret. Fund v. Robinson*, 455 U.S. 562, 575 (1982). Indeed, in describing the mandatory nature of the anti-discrimination provisions of Title VII, the Supreme Court has emphasized, "Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred ***can form no part of the collective-bargaining process*** since waiver of these rights would defeat the paramount congressional purpose behind Title VII." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) (emphasis added).

The same reasoning applies with equal force to the requirements of the Mandate. The requirements of the Mandate have been determined by the Director of the Office of Management and Budget, acting on a delegation of the President's authority pursuant to 3 U.S.C. § 301, to "improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." 86 Fed. Reg. 53691, 53692 (Sept. 28, 2021). Based on that determination, all federal contracts will include a clause requiring federal contractors and covered subcontractors, including Union Pacific, to comply with the Mandate. Union Pacific can no more ignore that requirement than it

5

can ignore the prohibitions against race or sex discrimination set forth in Title VII. Simply put, compliance with the commands of the Mandate, in the words of the Supreme Court, "can form no part of the collective bargaining process." *Alexander*, 415 U.S. at 51.

It is no answer for the Unions to claim that Union Pacific is required to comply with the Mandate only because it is a federal contractor. Union Pacific's decisions about which customers to serve, including the federal government, fall squarely within the scope of those fundamental business decisions at the core of management's entrepreneurial control that are not subject to bargaining. *See First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 676 (1981). In *First Nat'l Maint.*, the Supreme Court held that the National Labor Relations Act did not require a building maintenance contractor to bargain with the union representing its employees over the decision to terminate a money-losing contract with a particular customer. As the Court explained, "in establishing what issues must be submitted to the process of bargaining, Congress had no expectation that the elected union representative would become an equal partner in the running of the business enterprise in which the union's members are employed." *Id.* at 676. Moreover, the Court emphasized that a managerial decision will only be deemed to be a mandatory subject of bargaining "if the subject proposed for discussion is amenable to resolution through the bargaining process." *Id.* at 678. The Supreme Court reached a similar conclusion under the RLA in *Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Execs.' Ass'n*, 491 U.S. 490, 503-504 (1989). There, the Court held that a short line railroad was not required to bargain with the unions representing its employees over the decision to sell its assets to another railroad and go out of business. *Id.*

Union Pacific's decision to continue doing business with the federal government and with other customers who are also government contractors is likewise within the scope of those fundamental business decisions about which the Supreme Court has repeatedly held an employer

6

has no obligation to bargain. In particular, there is nothing about the decision to comply with the Mandate that is "amenable to resolution through the bargaining process" for that decision to be a mandatory subject of bargaining under *First Nat'l Maint.* Nothing Union Pacific or any of the Defendant Unions could negotiate at the bargaining table would change the dictates of the mandate or the timetable for compliance. And, if the parties were to engage in bargaining over the Unions' demands that Union Pacific not comply with the Mandate, the Unions would be prohibited from striking over those demands. *See National R.R. Pass. Corp. v. Transp. Workers Union of Amer.*, 373 F.3d 121, 126 (D.C. Cir. 2004) (holding that "the RLA prohibits the Unions from striking [over a non-mandatory subject of bargaining] even though the dispute is not amenable to resolution via the procedures of the RLA").

Indeed, because Union Pacific has a statutory obligation as a common carrier to provide service to the federal government upon request, it cannot bargain away that obligation simply to appease the Unions' opposition to the Mandate. The statutory common carrier obligation imposes a duty upon railroads to "provide transportation or services on reasonable request." 49 U.S.C. § 11101(a). "[R]ailroads are required, under their common carrier obligation, to establish rates and routes to move a shipper's traffic from origin to destination." *Cent. Power & Light Co. v. S. Pac. Transp. Co.*, 1 S.T.B. 1059, 1063 (1996). Included in this obligation are the requirements that Union Pacific "provide, in writing, common carrier rates to any person requesting them," and "provide rail service pursuant to those rates upon reasonable request." *State of Mont. v. BNSF Ry.*, NOR 42124, slip op. at 7 (STB served Apr. 26, 2013). Under the common carrier obligation, a railroad may not refuse to provide rail service merely because providing service would be inconvenient or unprofitable. *Decatur Cty. Comm'rs v. STB*, 308 F.3d 710, 715 (7th Cir. 2002).

7

Furthermore, the Unions cannot delay Union Pacific's compliance with the Mandate by demanding that Union Pacific engage in bargaining over the effects of such compliance on their members. Union Pacific recognizes that it has an effects bargaining obligation, and is complying with that obligation. However, the RLA does not prohibit or delay a rail carrier from taking action regarding a non-mandatory subject of bargaining pending completion of such effects bargaining. *See Pittsburgh & Lake Erie*, 491 U.S. at 503-504; *Chicago & North Western Transp. Co. v. Railway Labor Execs.' Ass'n*, 908 F.2d 144, 152-153 (7th Cir. 1990) (railroad was entitled to proceed with sale of rail line while effects of sale on employees were bargained).

Because it is crystal clear that Union Pacific is required to comply with the Mandate, the Court should *expeditiously* grant Union Pacific's request for a declaratory judgment that it is not required to bargain about the decision to comply with the Mandate. There is literally no time to wait for employees to become compliant.

    **B.    The Disputes Raised By The Unions Over Union Pacific's Compliance With The Mandate Are Minor Disputes Subject to Mandatory Arbitration Under the RLA.**

        **1.    Applicable Law**

The legal framework for determining whether a particular labor dispute is a minor dispute under the RLA is well-established. The purpose of the RLA "is to avoid any interruption to commerce or the operation of any carrier engaged therein." 45 U.S.C. § 151a(1); *Detroit and Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 154 (1969); *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253 (1994) ("*Hawaiian Airlines*"); *BLET v. UP*, 879 F.3d at 755. To that end, the RLA establishes mandatory procedures to govern disputes over the negotiation of CBAs and disputes over the meaning or application of such agreements.

Disputes over the formation of a CBA, or over efforts to change the terms of a CBA, are classified as "major disputes." Major disputes are "about creating new rights." *BMWE v. ATSF*,

8

138 F.3d at 638. Such disputes are subject to "a lengthy and involved dispute resolution process during which the parties are obligated to maintain the status quo." *Conrail*, 491 U.S. at 302-303; *see also* 45 U.S.C. §§ 152, Seventh, 155 and 156.

A minor dispute, by contrast, "contemplates the existence of a collective agreement already concluded" and "the dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Conrail*, 491 U.S. at 303 (*quoting Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945)). Under the RLA, the term "minor dispute" reflects that the nature of the dispute is one over the interpretation or application of an existing agreement, rather than a dispute over the formation of, or changes to, an agreement. *Conrail*, 491 U.S. at 303-05.

Section 3 of the RLA created the National Railroad Adjustment Board ("NRAB") and assigned the four Divisions of the NRAB jurisdiction over minor disputes involving specific crafts or classes of employees. 45 U.S.C. § 153, First (h). Section 3, Second of the RLA allows railroads and unions to establish arbitration panels known as "Public Law Boards" ("PLBs") or "Special Boards of Adjustment" ("SBAs") to decide disputes which are "otherwise referable" to the NRAB. 45 U.S.C. § 153, Second; *Conrail*, 491 U.S. at 303. Arbitration awards issued by the NRAB (or a PLB or SBA) are "final and binding" on the parties. 45 U.S.C. §§ 153, First (m) and Second. The NRAB (or PLB or SBA) "has exclusive jurisdiction over minor disputes." *Conrail*, 491 U.S. at 304; *BLET v. UP*, 879 F.3d at 758.

Congress charged the federal courts with a seminal but narrowly circumscribed role under this regime – that of taxonomist. *BLET v. UP*, 879 F.3d at 757. Courts are to "sort labor disputes into two piles, major or minor." *BMWE v. ATSF*, 138 F.3d at 638. In making the determination whether a dispute is minor, a court's role is limited to determining whether the carrier's position is

"arguably justified" by the CBA, including conditions implied therein by practice or course of dealing. *See Conrail*, 491 U.S. at 307. The carrier's burden in this respect is "relatively light;" so long as the carrier's position on the merits of the dispute is not "frivolous or obviously insubstantial," the dispute is minor. *Conrail*, 491 U.S. at 307; *BLET v. UP*, 879 F.3d at 758; *Brotherhood Maintenance of Way Employees Division v. Norfolk Southern Railway Co.*, 745 F.3d 808, 813-814 (7th Cir. 2014) ("*BMWED v. NS*"). The court does not decide the ultimate merits of the disputed labor contract provision, but solely whether the dispute can be categorized as one involving interpretation of a labor contract. *BLET v. UP*, 879 F.3d at 758; *Railway Labor Execs.' Ass'n v. Norfolk & Western Ry. Co.*, 833 F.2d 700, 704 (7th Cir. 1987) ("*RLEA v. N&W*"). While a minor dispute is being arbitrated, the carrier may unilaterally implement its position. *Burlington N. R.R. Co. v. United Transp. Union*, 862 F.2d 1266, 1272 (7th Cir. 1988) ("the carrier may act unilaterally until told to do otherwise by the arbitration board's decision."); *see also Conrail*, 491 U.S. at 304; *BLET v. UP*, 879 F.3d at 758.

Of particular relevance to this case, the Supreme Court and the Seventh Circuit have emphasized that rail industry collective bargaining agreements contain both express and implied terms, and that the parties' "practice, usage and custom" under their agreements create implied terms that are just as enforceable as a written agreement. *Conrail*, 491 U.S. at 303, 307; *BLET v. UP*, 879 F.3d at 756, 758; *RLEA v. N&W*, 833 F.2d at 705. As the Seventh Circuit explained in *RLEA v. N&W*, "Within the railroad industry in particular, it is common practice to omit from written agreements non-essential practices that are acceptable to both parties." *RLEA v. N&W*, 833 F.2d at 705. Therefore, the parties' agreement, "includes both the specific terms set forth in the written agreement and any well established practices that constitute a 'course of dealing' between the carrier and employees." *Id.*

10

### 2. The Disputes Over Union Pacific's Compliance With The Mandate Constitute Minor Disputes.

Applying the well-established standards set forth above, there can be no question that the disputes raised by the Unions involving Union Pacific's compliance with the Mandate constitute minor disputes under the RLA.

#### a) Compliance With Government Mandates

As set forth in Plaintiff's Statement of Material Facts, Union Pacific has a long history of taking unilateral action to comply with various mandates included in federal laws, rules and regulations. (Stmt. of Mat. Facts at ¶¶ 25-27). Among many other things, Union Pacific unilaterally implemented changes in Hours of Service requirements, complied with federal certification requirements for locomotive engineers and conductors, and complied with drug testing protocols mandated by the Federal Railroad Administration. Because Union Pacific has an established practice of complying with government mandates without first bargaining over such compliance, it is at least arguable that an implied term of Union Pacific's agreements with the Defendant Unions permits it do so. While the Unions may dispute the extent to which Union Pacific has taken unilateral action to comply with prior government mandates, it is not for this Court to resolve that dispute. As the Seventh Circuit explained in *BLET v. UP*, "Wading through the competing declarations to determine the actual authority the Railroad had to modify the disciplinary policies, based on past practices, is a job for the arbitrator." *BLET v. UP*, 879 F.3d at 759. Thus, any dispute over Union Pacific's compliance with the requirement that employees be vaccinated against COVID-19 in accordance with the Mandate is a minor dispute that must be resolved in arbitration.

#### b) Establishment of Fitness for Duty Standards.

11

The same analysis applies to Union Pacific's history of establishing fitness for duty standards. As demonstrated in Union Pacific's Statement of Material Facts, Union Pacific has a long history of unilaterally implementing and enforcing medical standards for determining employees' fitness for duty. (Stmt. of Mat. Facts ¶ 28). Thus, it is at least arguable that Union Pacific has an implied right under its collective bargaining agreements with the Defendant Unions to set and enforce medical standards for determining employees' fitness for duty. It is Union Pacific's position that compliance with the requirements of the Mandate falls squarely within such an implied term of its agreements. In this case, Union Pacific's position is not just arguable; it is mandated by federal law. Simply put, compliance with the Mandate is a minimum requirement of fitness for duty to work in covered railroad positions. If the Unions have a quarrel with that Mandate, their recourse is to petition the federal government, not Union Pacific.

The complaint filed by SMART-TD makes reference to a collectively-bargained process whereby an employee is allowed to challenge Union Pacific's decision to disqualify an employee for medical reasons based on the judgment of Union Pacific's medical staff. (Stmt. of Mat. Facts, Ex. 6 at ¶¶ 12-13). But, that process has no application where, as here, the federal government has established a mandatory vaccination requirement that cannot be disputed by either the employee's or the Carrier's physicians. Moreover, it is well recognized that Union Pacific has a "preexisting right under the CBA to hold employees out of service, in this case due to illness or exposure to COVID-19. This is not a new right or change to the status quo which would violate the RLA." *Union Pac. R.R. Co. v. Brotherhood of Maint. of Way Empl. Div./IBT*, 511 F. Supp. 3d 987, 1000 (D. Neb. 2021) ("*UP v. BMWED*").

### c) Incentive Payments and Continuation of Pay

The same analysis applies to the Unions' challenges to Union Pacific's offer to pay employees $300 as an incentive for getting vaccinated, and to provide the Supplemental Pay

12

Program, which continues the pay of vaccinated employees who experience a breakthrough infection as a result of a workplace exposure. Union Pacific has a long history of providing incentive payments to employees for achieving certain safety or operating goals. (Stmt. of Mat. Facts ¶¶ 29-33). Union Pacific's offer of a $300 incentive payment to encourage employees to get vaccinated in accordance with the Mandate is consistent with those past incentive programs. Similarly, Union Pacific also has a history of unilaterally implementing programs that continue the regular pay of employees who are unable to work due to a variety of reasons, including the need to quarantine as a result of a COVID-19 exposure, involvement in a "Critical Incident" such as an accident, or as a result of a natural disaster. (Stmt. of Mat. Facts ¶¶ 34-39). Again, this history of unilateral action is more than sufficient to demonstrate that Union Pacific has, at least, an arguable, non-frivolous basis for its position that an implied term of its agreements with Defendants allows it to provide such incentive payments or pay continuation programs.

   **C.**  **The Defendant Unions Must Seek Changes to Existing Agreements through Collective Bargaining Under Section 6 of the RLA.**

  Any demand by the Defendant Unions for additional pay or benefits in connection with the Mandate constitutes a "major dispute" that must be resolved through the RLA's mandatory procedures for negotiation and mediation of such disputes. Major disputes are "disputes over the formation of collective agreements or efforts to secure them," and "arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Brotherhood of Ry., Airline & Steamship Clerks v. Atchison, Topeka & Santa Fe Ry. Co.*, 847 F.2d 403, 405 (7th Cir. 1988) (quoting *Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945)). "'They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.'" *Id.* at 405-406; *see also BLET*

*v. UP*, 879 F.3d at 757; *Brotherhood of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry.*, 138 F.3d 635, 638 (7th Cir. 1997) ("*BMWE v. ATSF*").

The RLA's major dispute procedures mandate that the parties undertake "a long course of bargaining and mediation, during which they are obliged to preserve the status quo." *BMWE v. ATSF*, 138 F.3d at 638; *see also*, *Conrail v. RLEA*, 491 U.S. at 303. When rail carriers and their employees are involved in major disputes, they must submit to the bargaining, mediation and emergency board procedures specified in and required by Sections 2 First, 5, 6 and 10 of the RLA before resorting to strikes or other forms of economic self-help. *Conrail v. RLEA*, 491 U.S. at 302-03. The RLA's major dispute resolution procedures were designed by Congress to be "**almost interminable**." *Detroit and Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 149 (1969). If a union strikes during the status quo period, the strike is enjoinable, even without regard to the customary showing of irreparable injury. *Conrail*, 491 U.S. at 302-03.

It is indisputable that Union Pacific and the Defendant Unions are in the RLA status quo period. The parties have exchanged Section 6 notices, beginning the process that will lead to a new agreement. Under the RLA, the Defendant Unions have an obligation to observe the status quo — and to refrain from economic action — until exhausting the RLA's major dispute resolution processes. As there is no dispute that the parties remain in the RLA's major dispute resolution processes, the Defendant Unions must exhaust those processes with respect to any demands for additional pay or benefits associated with Union Pacific's compliance with the Mandate before they can resort to self-help. *Chicago & North Western Ry. Co. v. United Transp. Union*, 402 U.S. 570 (1971).

On this point, the U.S. District Court for the District of Nebraska enjoined BMWED earlier this year from exercising self-help over the Union's COVID-related bargaining proposals, ruling

14

that BMWED's demands for additional pay and paid leave were part of the ongoing "major dispute" as to which BMWED is obligated to maintain the status quo:

> BMWED is demanding certain changes to Union Pacific's COVID-19 response. BMWED argues these changes are focused on health and safety concerns and because its "demand is strictly related to the current Covid-19 crisis" it falls outside the scope of the ongoing CBA negotiations. … Union Pacific argues BMWED's demands are primarily economic in nature and therefore directly overlap with those made in its Section 6 notice. … The Court concludes this dispute arises out of the negotiation of a new CBA and is therefore a major dispute under the RLA.

*UP v. BMWED*, 511 F.Supp.3d at 998.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Union Pacific Railroad Company respectfully requests that its Motion for Summary Judgment be granted.

Respectfully submitted,

*/s/ Jeremy J. Glenn*
JEREMY J. GLENN
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, IL 60606
(312) 474-7981 (phone)
(312) 706-9791 (fax)
jglenn@cozen.com

ROBERT S. HAWKINS (*pro hac vice filed*)
ANDREW J. ROLFES (*pro hac vice filed*)
ANDREW J. ROLFES
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2015
(646) 461-2097 (fax)
rhawkins@cozen.com
arolfes@cozen.com

Attorneys for Plaintiff
UNION PACIFIC RAILROAD COMPANY

15

## CERTIFICATE OF SERVICE

I, Jeremy J. Glenn, hereby certify that on this 25th day of October 2021, I caused a true and correct copy of the foregoing **Memorandum of Law In Support of Plaintiff's Motion for Summary Judgment** to be served upon all counsel of record via the Court's electronic filing system.

/s/ Jeremy J. Glenn
JEREMY J. GLENN