UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS, TRANSPORTATION DIVISION,<br><br>    Plaintiff,<br><br>UNION PACIFIC RAILROAD COMPANY, et al.,<br><br>    Defendant. | Civil Action Nos.: 21-cv-5506, 21-cv-5622, 21-cv-5502<br><br>Judge Lee |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR PRELIMINARY INJUCTION**

**TABLE OF CONTENTS**

Page(s)

I. INTRODUCTION ..................................................................................................................1

II. FACTUAL BACKGROUND AND LEGAL LANDSCAPE .....................................................1

   A. Background of the Parties........................................................................................... 1

   B. Collective Bargaining Under the Railway Labor Act............................................... 1

   C. Current Situation........................................................................................................ 3

III. LEGAL STANDARD ...........................................................................................................6

IV. ARGUMENT .......................................................................................................................6

   A. SMART-TD is Likely to Succeed on the Merits that the Railroad's Actions Constitute a Major Dispute Under the Railway Labor Act. ........................................................................ 6

      1) The Status Quo Provisions under the RLA. ....................................................... 6

      2) The Current Dispute Is Major. ........................................................................... 8

         a) The Railroads are Exempt from Executive Order 14042. ............................ 8

         b) The Railroads Failure to Bargain Prior to Implementation of a Mandatory Vaccine is a Condition of Employment Constitutes a Major Dispute................................................. 10

         c) The Railroads are Required to Bargain over the Effects of the Vaccine Mandate..... 12

   B. No Showing of Irreparable Injury is Necessary to Issue a Status Quo Injunction. ........... 14

   C. The Balance of Harms Favors a Status Quo Injunction...................................................... 14

   D. Public Interest Favors the Issuance of SMART-TD's Requested Injunction. .................... 15

V. CONCLUSION ....................................................................................................................15

## I.    INTRODUCTION

The Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART-TD") is seeking declaratory and injunctive relief against Union Pacific Railroad Company ("UP") and Norfolk Southern Railway Company ("NS") (hereinafter "the Railroads" or "the Carriers") under the Railway Labor Act ("RLA" or "the Act"), 45 U.S.C. §§ 151-88, based upon the Railroads' unilateral abrogation of the parties' agreements in contravention of the Act. Hiding behind the vaccine mandate imposed on federal contractors, the Railroads have imposed changes to the terms and conditions of employment without engaging in the required bargaining procedure set forth in Section 6 of the RLA. 45 U.S.C. § 156. In addition, the Railroads have failed and/or refused to bargain with the Unions over the effects of such decision, despite at least one Railroad acknowledging that such constitutes a major dispute. In essence, the Railroads have rewritten the terms of the agreements with the Union in violation of the RLA, entitling the Union to a status quo injunction.

## II.    FACTUAL BACKGROUND AND LEGAL LANDSCAPE

### A.  Background of the Parties

NS and UP are common carriers by railroad engaged in interstate commerce, and "carriers" as defined by the RLA. 45 U.S.C. § 151 First. (NS Compl. ¶ 5; UP SAC ¶ 1). SMART-TD is the duly authorized "representative" of train service employees employed by the Railroads. 45 U.S.C. § 151 Sixth. (NS Compl. ¶ 6; UP SAC ¶ 2).

### B.  Collective Bargaining Under the Railway Labor Act

Collective bargaining between railroads and their employees' representatives over rates of pay, rules, and working conditions is governed by the RLA. 45 U.S.C. § 151, *et seq*. The primary directive of the RLA is set out at the very beginning of the Act.

> It <u>shall be the duty of all carriers</u>, their officers, agents, and employees <u>to exert every reasonable effort to make and maintain agreements</u> concerning rates of pay, rules, and working conditions …

45 U.S.C. § 152 First (emphasis added). This is not a mere exhortation, but a directive to the parties, *Chicago & N.W. Ry. v. United Transp. Union*, 402 U.S. 570, 577 (1977), and "has been described as the 'heart' of the RLA." *United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers,* 243 F.3d 349, 361 (7th Cir. 2001) (citing *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 377-78 (1969)).

The status quo provisions command that a carrier must maintain current working conditions, and that unilateral changes in those conditions are prohibited absent engaging in the required bargaining process. 45 U.S.C. §§ 152, Seventh, 156.

To resolve disputes between the parties, the RLA established two separate mandatory dispute resolution procedures: one for "minor disputes" and one for "major disputes." These terms are not found in the RLA's text, but are shorthand terms developed by the courts to describe the Act's dispute resolution procedures. *See generally Consol. Rail Corp. v. Ry. Labor Exec. Ass'n*, 491 U.S. 299, 307 (1989) ("*Conrail*"). A "major dispute" is a dispute over contract formation or amendment of a collective-bargaining agreement ("CBA"). *Elgin, Joliet & E. Ry. v. Burley*, 325 U.S. 711 (1945). Such disputes arise where a CBA does not exist or where one of the parties seeks to <u>change the terms of an existing CBA</u>. *Conrail*, 491 U.S. at 302. "The issue in a major dispute 'is not whether an existing agreement controls the controversy'; instead, the focus is on 'the acquisition of rights for the future, not [the] assertion of rights claimed to have vested in the past.'" *Wheeling & Lake Erie Ry. v. Bhd. of Loco. Eng'rs & Trainmen*, 789 F.3d 681, 690 (6th Cir. 2015) (hereinafter "*W&LE*") (citing *Burley,* 325 U.S. at 723).

For major disputes, the Act provides a detailed framework for resolution. Under the RLA,

a CBA exists in perpetuity and can only be changed through a very specific process. 45 U.S.C. § 156. The "major dispute" procedures are initiated by the service of a bargaining notice under Section 6, 45 U.S.C. § 156. These "Section 6 Notices" are written proposals for changes in CBAs. *See CSX Transp., Inc. v. United Transp. Union*, 395 F.3d 365 (6th Cir. 2005). The "major dispute" procedures include conference, negotiation, and mediation between the parties. 45 U.S.C. §§ 152 Second, 155 First, 156, 160. Until these procedures have been exhausted, the parties are bound by the Act's "status quo" requirements. *See, e.g., Conrail*, 491 U.S. at 302-03; 45 U.S.C. §§ 152 First, 152 Seventh, 156. Only once these procedures have been exhausted, are the parties free to engage in self-help. *See generally, Burlington N. R.R. v. Bhd. of Maint. of Way Empl.*, 481 U.S. 429 (1987); *Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 149 (1969) ("*Shore Line*").

In contrast, a "minor dispute" is a disagreement growing out of the interpretation or application of an existing CBA, rather than an attempt to change CBA terms. *See, e.g., Conrail*, 491 U.S. at 303; *Henegar v. Banta*, 27 F.3d 223, 225 (6th Cir. 1994). "Minor disputes" are required to be addressed by the parties first through handling "on the property," 45 U.S.C. §§ 152 Sixth, 153 First (i), and if the dispute is not resolved through such, by final and binding arbitration. *Id*. § 153 First (i); *see also Conrail*, 491 U.S. at 303.

The issue presented here is a major dispute. The Railroads are attempting to ignore the mandatory process by unilaterally imposing changes to the working conditions established through the parties' CBA and settled past practice. Court intervention is necessary to uphold the Act and maintain the status quo.

### C. Current Situation

The facts concerning this matter are contained in the respective Verified Complaints and

3

Declarations filed herewith, the essential portions of which are reproduced below.

The Union and Railroads are parties to several CBAs that control the terms and conditions of employment, including negotiated provisions on wages, leaves of absences, and the process for medical disqualification. (Phillips Decl. ¶ 2; Edington Decl. ¶ 2). In lieu of bargaining with the Unions over changes in terms and conditions or employment regarding vaccines and the effects stemming therefrom, the Railroads have attempted to hide behind an executive order, despite by its own terms, it does not apply to the Railroads. (Phillips Decl. ¶ 7, Exs. A, F; Edington Decl. ¶ 4).

On September 9, 2021, President Biden issued a pair of executive orders containing vaccine mandates for federal executive agencies and *certain* federal contractors. Presidential Documents, Executive Order 14042 of September 9, 2021, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed.Reg. 50985 (Sept. 14, 2021) (hereinafter "EO"), *see also* Edington Decl., Ex. 1. The EO's stated rationale is to "provide adequate COVID-19 safeguards to [contractors'] workers performing on or in connection with a Federal Government contract or contract-like instrument as described in section 5(a) of this order, … which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors … ." *Id.* at Sec. 1. However, Section 5(a) sets forth the applicability of covered contractors, including contracts covered by the Service Contract Act ("SCA"), *id.* at Sec. 5(a)(ii), which explicitly excludes "contracts for carriage of freight or personnel by … railway line … where published tariff rates are in effect." 41 U.S.C. § 6702(b)(3).

On September 24, 2021, the Safer Federal Workforce Task Force ("SFWTF") issued its "COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors," *available at* https://www.saferfederalworkforce.gov/contractors/. This guidance requires "COVID-19

4

vaccination of covered contractor employees, except in limited circumstances where an employee is legally entitled to an accommodation …" by December 8, 2021. *Id.*at 5.

On October 28, 2021, White House Coronavirus Response Coordinator Jeff Zients clarified that the Administration's deadline would not require the immediate layoff of unvaccinated workers, and "for any of the probably relatively small percent of employees that are not in compliance they'll go through education, counseling, accommodations and then enforcement." https://www.reuters.com/world/us/white-house-signals-flexibility-over-dec-8-vaccine-deadline-businesses-2021-10-27/. "We're creating flexibility within the system … There is not a cliff here," Zients said, emphasizing the goal is to get people vaccinated "not to punish them so we do not expect any disruptions." *Id.* Indeed, such is consistent with the SFWTF's recommendations to covered contractors when an employee refuses to be vaccinated.[1]

Nevertheless, the Railroads initially ordered that their employees be fully vaccinated by what they contend is the "federally mandated deadline" of December 8, 2021.[2] (Phillips Decl. ¶¶ 4-6; Edington Decl. ¶¶ 5, 13). In addition, the Railroads have directly informed their employees that they would receive monetary compensation and/or time off for showing proof of such vaccinations. (Phillips Decl. ¶¶ 4-6; Edington Decl. ¶ 5). At no point prior to the Railroads' unilateral promulgation of these changes to the wages and terms and conditions of employment did they bargain with SMART-TD over the implementation of these changes nor the effects of

---

[1] *See* https://www.saferfederalworkforce.gov/faq/contractors/ (noting "[g]uidance for Federal agencies is to utilize an enforcement policy that encourages compliance, including through a limited period of counseling and education, followed by additional disciplinary measures <u>if necessary</u>. Removal occurs only after continued noncompliance. Guidance for Federal agencies is that employees should <u>not</u> be placed on administrative leave while the agency is pursuing an adverse action for refusal to be vaccinated but will be required to follow safety protocols for employees who are not fully vaccinated when reporting to agency worksites.").

[2] Without any consultation or bargaining with the Union, the Railroads extended the deadline until January 4, 2022. (Phillips Decl. ¶ 12; Edington Decl. ¶ 13).

said implementation, including bonus payments to employees, time off to get vaccinated or for reactions related to vaccination, or the consequences for employees who are not vaccinated by the deadlines given. (Phillips Decl. ¶ 7; Edington Decl. ¶ 13). In response, the respective SMART-TD General Chairpersons have objected to the Railroads' unilateral actions in requiring vaccination <u>as a condition of employment</u> absent engaging in the required bargaining process set forth in Section 6. (Phillips Decl. ¶ 9, Ex. C; Edington Decl. ¶ 6, Ex. 3). Although the Union requested that the Railroads bargain over proposed changes and any effects related thereto, to date, the Railroads have refused. (Phillips Decl. ¶ 7; Edington Decl. ¶ 13).

### III.    LEGAL STANDARD

"The purpose of preliminary injunctive relief is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir.1998). Courts consider the following when deciding whether to grant injunctive relief: (1) whether the movant has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) the threat of irreparable harm to the movant; (4) the balance of harms between the movant and other party; and (5) the public interest. *Id.* As demonstrated herein, the Union's case meets these factors. The Railroads prematurely resorted to self-help in violation of their statutory status quo requirements and the Union is entitled to an injunction restoring the status quo. *See Conrail,* 491 U.S. at 303; *see also W&LE*, 789 F.3d at 691.

### IV.    ARGUMENT

**A. SMART-TD is Likely to Succeed on the Merits that the Railroad's Actions Constitute a Major Dispute Under the Railway Labor Act.**

*1) The Status Quo Provisions under the RLA.*

The RLA's purposeful directive bars a carrier from unilaterally altering the existing

6

employment conditions or the terms of the bargained-for agreement. 45 U.S.C. § 152 First, Seventh. Any change can <u>only</u> be accomplished through the required process of Section 6. 45 U.S.C. § 156. Despite such, the Railroads here have altered the wages and terms and conditions of employment without engaging in any negotiations. Such unilateral change violates the Act and must be enjoined.

Section 2, First which, as noted above, "has been described as the 'heart' of the RLA," provides:

> It <u>shall be the duty of all carriers</u>, their officers, agents, and employees to exert every reasonable effort <u>to make and maintain agreements concerning rates of pay, rules, and working conditions</u>, and to settle all disputes, whether arising out of the application of such agreements or otherwise …

45 U.S.C. § 152, First (emphasis added). Section 2, Seventh provides:

> <u>No carrier</u>, its officers or agents <u>shall change the rates of pay, rules or working conditions</u> of its employees as a class as embodied in agreements **except** in the manner prescribed in such agreements or in section 156 of this title.

45 U.S.C. § 152 Seventh (emphasis added). These provisions command that the Carrier <u>must</u> maintain current working conditions, and that unilateral changes to those conditions are prohibited absent engaging in the required bargaining process set forth in Section 6. 45 U.S.C. § 156 ("<u>In every case</u> where such notice of intended changes has been given … rates of pay, rules, or working conditions <u>shall not be altered by the carrier until the controversy has been finally acted upon</u> … .") (emphasis added).

Collectively, these provisions constitute the status quo provisions of the Act, and may be enforced by the issuance of a status quo preliminary injunction without the necessity of showing irreparable harm. *See Conrail*, 491 U.S. at 303 ("[T]he district courts have subject matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury."); *see also Shore Line,* 396 U.S. at 156-57

7

(citing Section 2 Seventh, 45 U.S.C. § 152 Seventh); *Chicago & Nw.,* 402 U.S. 570 (citing Section 2 First, 45 U.S.C. § 152 First); *W&LE*, 789 F.3d at 691.

### 2) The Current Dispute Is Major.

Where carriers attempt to ignore and change the terms of the agreement, as the Railroads do here, courts have found the disputes to be "major." *See* 45 U.S.C. § 152 Seventh; *Shore Line*, 396 U.S. 142 (enjoining employer's attempt to change working conditions without bargaining); *see also W&LE*, 789 F.3d. at 696 (finding carrier's violation of the crew consist provision to be a major dispute); *Bhd. of Loco. Eng'rs v. Springfield Terminal Ry.*, 210 F.3d 18, 31-32 (1st Cir. 2000) (finding carrier's failure to negotiate right to contract out work in CBA and subsequent attempt to contract out work to related corporation raised major dispute); *St. Louis Sw. Ry. v. Bhd. of R.R. Signalmen*, 665 F.2d 987, 998 (10th Cir. 1981); *Burlington N. R.R. v. United Transp. Union*, 862 F.2d 1266, 1275 (7th Cir. 1988); *United Transp. Union v. Gateway W. Ry.*, No. 95-0908-CV-W-1 1995 WL 842729, at *2-3 (W.D.Mo. Nov. 14, 1995) (finding major dispute where carrier ignored seniority provisions in contract and promoted employees out of order.) Here, the Carrier has changed the agreement, imprinting new terms without bargaining. *Conrail*, 491 U.S. at 302-03; *Shore Line*, 396 U.S. 142; *Florida East Coast Ry. v. Bhd. of Loco. Eng'rs*, 362 F.2d 482, 483 (5th Cir. 1966) (until railroad complies with "major" dispute process there can be no change in working conditions). Such is a major dispute and should be enjoined.

### a) The Railroads are Exempt from Executive Order 14042.

While the Railroads attempt to justify avoiding bargaining, claiming that they are bound by the EO, that position rings hollow. Section 5 of the EO limits its applicability to:

> any new contract; new contract-like instrument; new solicitation for a contract or contract-like instrument; extension or renewal of an existing contract or contract-like instrument; and exercise of an option on an existing contract or contract-like instrument, **if**: … **(ii) it is a contract or contract-like instrument for services**

8

**covered by the [SCA], 41 U.S.C. 6701 et seq.; …**

EO Sec. 5 (emphasis added). The only section the Railroads' contracts would arguably fall under is (a)(ii), a contract for services covered under the SCA. EO Sec. 5(a)(ii). Indeed, both NS and UP contend that they have contracts with the Department of Defense to transport freight. *See, e.g.,* Dkt. No. 12, UP SOF ¶ 15; NS Compl. ¶ 21. However, the SCA expressly excludes "a contract for the carriage of freight or personnel by vessel, airplane, bus, truck, express, railway line … where published tariff rates are in effect." 41 U.S.C. § 6702(b)(3).

This exclusion was analyzed by the Eighth Circuit in *Williams v. U.S. Dep't of Lab.*, 697 F.2d 842 (8th Cir. 1983). In that case, it was alleged that Williams, who contracted with the Air Force for preparation of personal property of military personnel for movement and storage, violated the SCA by failing to pay his employees the required prevailing wage rates. *Id.* Williams contended he was exempted citing to then § 356(3), which exempts "[a]ny contract for the carriage of freight … by truck … where published tariff rates are in effect." 697 F.2d at 843. The administrative law judge ("ALJ") found the contracts were "primarily for packing and unpacking and related services and [were] not primarily for the carriage of freight," and therefore the exemption did not apply. *Id.* at 843-44. The district court and Eighth Circuit "looked to the broader transactional setting and the economic reality of these contracts," and affirmed the decision, noting that the "intent of the contracts ware [sic] to provide Scott Air Force Base with packing and crating" and not for carriage. *Id.* at 843-45 (quoting *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730 (1947)). In contrast, the intent of any contracts between the Railroads and military is for the carriage of freight.[3] Therefore, the SCA's express exclusion renders the EO inapplicable to the

---

[3] There can be no dispute that published tariff rates are in effect. *See* 49 U.S.C. § 10721. *See* UP Published Tariff Rates, *available at*

9

Railroads, and their excuse for not bargaining evaporates.

Indeed, such is consistent with the Railroad's noncompliance with Executive Orders containing nearly verbatim applicability language and exclusions. For example, former President Barack Obama signed Executive Order 13706, Establishing Paid Sick Leave for Federal Contractors, on September 7, 2015, requiring parties that contract with the Federal Government to provide their employees with up to seven days of paid sick leave annually, including paid leave allowing for family care. 80 FR 54697. That EO likewise applied to contracts covered by the SCA. *See id.*, Sec. 6(d)(i)(B). In the six years since the EO's mandate of paid sick leave on federal contracts, the Railroads have made no effort to comply with such, likely concluding they were exempt.[4] If they are exempt from that EO, they are also exempt from the instant EO, which contains identical applicability language and exclusions. *Compare* 80 FR 54697, Sec. 6, with EO, Sec. 5. The Railroads cannot hold such directly contrary positions as suits their needs on any given day.

b) **The Railroads Failure to Bargain Prior to Implementation of a Mandatory Vaccine is a Condition of Employment Constitutes a Major Dispute.**

In contending that the dispute is minor, it appears the Railroads' argument hangs on its

---

https://www.up.com/cs/groups/public/@uprr/@customers/@announcements/@agriculturalproducts/documents/ms-nativedocuments/wcccon1015014.pdf (last visited Nov. 1, 2021); NS Published Tariff Rates, *available at* http://www.nscorp.com/nscorphtml/publications/NS8002-A_old.pdf (last visited Nov. 1, 2021); Military Freight Traffic Unified Rules Publication-1 (MFTURP-1), *available at* https://www.sddc.army.mil/pubs/Shared%20Documents/MFTRUP-1.pdf ("The mileage allowances set forth in the Freight Tariff RIC 6007-M, 'Mileage Allowances and Rules Governing the Handling and Payment of Mileage: Also Charges on Cars of Private Ownership' issued by American Short Line and Regional Railroad Association, shall be the minimum standard that shall be accepted by DoD for use of DoD owned rail cars.").

[4] To the contrary, they have consistently fought the imposition of paid sick leave even where mandated by state law. *See, e.g., Nat'l R.R. Passenger Corp. v. Su*, No. 2:15-CV-0924-KJM-EFB, 2021 WL 1253381 (E.D. Cal. Apr. 5, 2021) (railroads sought to overturn California paid leave law); *CSX Transportation, Inc. v. Healey*, 861 F.3d 276 (1st Cir. 2017) (railroads sought to overturn Massachusetts paid leave law).

assertion they are required to comply with law and governmental rulings without bargaining (including the federal Hours of Service Act, Rail Safety Improvement Act of 2008, Engineer Certification, Conductor Certification, Commercial Driver's Licenses, and Drug and Alcohol testing). *See* NS Compl. ¶ 16. This misses the point and ignores the RLA which controls the Railroads actions here. The Railway Labor Act, the governing statute here, was enacted by Congress in 1926, to ensure that "rates of pay and working conditions … shall not be altered during the entire period of utilization of this law." *Shore Line* at 152 n.19. The Railroads are unable to circumvent the bargaining process set forth in the Act under the guise of following an EO. Furthermore, usurping the collective bargaining rights of represented employees was not the intent of the EO here. Indeed, the Administration officials and SFWTF have made that clear. *See supra*. Moreover, an executive order – even where applicable – is not an act of Congress or a regulation promulgated by the federal agency tasked with enforcing rail safety matters, *i.e.* the Federal Railroad Administration. Most of the matters cited by the Railroads were items that unions themselves lobbied Congress to put in effect.

      To the extent that the Railroads now contend that they have an implied right to set fitness for duty standards under existing agreements and therefore their unilateral implementation of a vaccine mandate is a minor dispute, such is not in accord with the controlling law or facts. (NS Compl. ¶¶ 13-15; UP SAC ¶¶ 45-47). Indeed, nowhere in the Railroads' vaccine mandate policies do they even mention that vaccination is required as a matter of fitness for duty. *See, e.g.,* Phillips Decl. Ex. F; Edington Decl. Ex. 10). Nor have the Railroads articulated how an unvaccinated employee is medically unfit for duty. Rather, they rely solely on the vaccine mandate contained in the EO. (Phillips Decl. Ex. F; Edington Decl. Ex. 10).

      It is undisputed that the Railroads have implemented a mandatory vaccine requirement as

a condition of employment without engaging in the required Section 6 bargaining process. In fact, UP appears to acknowledge that it is not permitted to make changes absent bargaining in accordance with Section 6 and that the parties here are engaged in a major dispute. (UP SAC ¶¶ 65-66). Until completion of that process, the Railroads must return to the "actual, objective working conditions and practices" that were in effect prior, *i.e.* the *status quo* that existed before imposition of the vaccine mandate. *Shore Line,* 396 U.S. at 152-53; *Jacksonville Terminal Co.*, 394 U.S. at 378 ("While the dispute is working its way through [the Section 6] stages, neither party may unilaterally alter the status quo. §§2, Seventh; 5, First; 6; 10 [45 U.S.C. §152, Seventh; §155, First; §156, §160].").

    c) ***The Railroads are Required to Bargain over the Effects of the Vaccine Mandate.***

The law is well settled that an employer has a duty to engage in bargaining over the "effects" of management decisions, even where it may not be required to bargain over the decision itself. *See, e.g., First Nat'l Maint. Corp. v. N.L.R.B.*, 452 U.S. 666, 681 (1981);[5] *see also Pittsburgh & Lake Erie R. Co. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 490, 512 (1989) ("*P&LE*") (holding railroad had duty to bargain over effects of line sale); *C&NW v. RLEA*, 908 F.2d at 152 (same); *Ry. Lab. Executives' Ass'n v. Chicago & Nw. Transp. Co.*, 890 F.2d 1024, 1026 (8th Cir. 1989) ("*RLEA v. C&NW*").[6] Indeed, at least one Circuit has held that the failure to

---

[5] The NLRB General Counsel recently issued a Memorandum clarifying that an employer remains obligated to bargain in response to the Department of Labor's coronavirus Emergency Temporary Standard. *Responding to Inquiries Regarding Bargaining Obligations Under the Department of Labor's Emergency Temporary Standard to Protect Workers from Coronavirus*, GC 22-03 (November 10, 2021) (noting parties must bargain over the implementation of vaccine mandate decision and effects thereof).

[6] Effects bargaining under the RLA has predominately been raised by unions in line sale cases. In those cases, courts have uniformly held that even though the railroad does not have a duty to bargain over the decision to sell its line, it did have a duty to bargain over the effects of such decision. *See, e.g., P&LE*, 491 U.S. at 503; *C&NW v. RLEA,* 908 F.2d at 152; *RLEA v. C&NW,* 890 F.2d at 1026.

engage in effects bargaining constitutes a major dispute. *RLEA v. C&NW*, 890 F.2d at 1026 ("[I]n *P&LE,* and the Supreme Court there held that the dispute was a major one and that the railroad company was obligated to bargain with the union as to the effects of the sale."). Therefore, regardless of whether the EO applies to the Railroads and whether the Railroads must bargain over the mandate itself, <u>at a minimum</u>, the RLA commands that the Railroads engage in effects bargaining. As applied here, bargainable issues surrounding any mandate may include the amount of time before the mandate takes effect; the process for handling potential religious and medical exemptions; the impact on an employee who fails to comply with any mandate; any paid time off to get vaccinated, to deal with any adverse reactions from vaccination, and/or for testing; how vaccination status will be confirmed; whether there are any viable alternatives to a vaccine mandate; and incentives to encourage vaccination.

The Railroads however have failed to bargain over any of these effects, but have instead unilaterally implemented other "effects," including time off and/or payments directly to represented individuals. (Phillips Decl. ¶ 7; Edington Decl. ¶ 13). In addition, they have unilaterally imposed penalties for any employees who fail to get vaccinated by January 4, including terminating and/or placing them on unpaid leave; notwithstanding that there are clear provisions in the CBAs regarding discipline and leaves of absences. (Phillips Decl. ¶ 7; Edington Decl. ¶ 13). These penalties are particularly unreasonable where these workers, deemed essential, have been working tirelessly for nearly twenty-one months throughout the entirety of the pandemic. (Phillips Decl. ¶ 7; Edington Decl. ¶ 13). The Railroads cannot attempt to hide behind the EO and impose such as a condition of employment, and most certainly, cannot refuse to treat with the employees' representative over very basic terms and the effects of such. (Phillips Decl. ¶ 7; Edington Decl. ¶ 13). Such action violates the RLA and should be enjoined.

## B. No Showing of Irreparable Injury is Necessary to Issue a Status Quo Injunction.

Courts have long held that no showing of irreparable harm is required to issue a status quo preliminary injunction. *See, e.g., Flight Options, LLC v. Int'l Bhd. of Teamsters 1108,* 863 F.3d 529, 545 (6th Cir. 2017) (noting "[t]he second factor is inapplicable in the context of an RLA dispute, because courts may enjoin a violation of the status quo pending completion of the required [Section 6] procedures, without the customary showing of irreparable injury.'") (quoting *Conrail*, 491 U.S. at 303; *see also S. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen*, 337 F.2d 127, 133-34 (D.C. Cir. 1964) (holding irreparable injury showing unnecessary for preliminary injunction under RLA status quo provision); *W&LE*, 789 F.3d at 691 ("[T]he party moving for injunctive relief in federal court is not required to make the usual showing of irreparable injury."). Nevertheless, the Union would be irreparably harmed by the Railroad's violation of the status quo, in contravention of the statutory mandate.

## C. The Balance of Harms Favors a Status Quo Injunction.

In addition to not requiring a showing of irreparable harm, courts routinely grant status quo injunctions under the RLA without weighing the traditional balancing of equities. *See, e.g., Brotherhood of Maint. of Way Empl., Lodge 16 v. Burlington N. R.R. Co.,* 802 F.2d 1016, 1021 (8th Cir. 1986) ("If the dispute is major [under the RLA], the courts have broad powers to enjoin unilateral action by either side in order to preserve the status quo while settlement procedures go forward. Such an injunction may issue <u>without regard to the usual balancing of the equities</u>.") (emphasis added). Even if such was required, however, the balance of harms weighs in the Union's favor and supports the issuance of the requested injunctive relief. Indeed, as recognized in *Flight Options*, the Carrier is "unlikely to suffer substantial harm from being required to preserve the status quo," in part where they are "obliged by statute to do so." 863 F.3d at 545.

Here, no harm will befall the Railroads in granting an injunction that maintains the status quo, while the Union and employees will be harmed by the failure of the Railroads to abide by the existing agreements and bypassing the Union before instituting changes to the mandatory terms and conditions of employment. By its very nature, bypassing the Union undermines the Union's status and power as the collective bargaining representative and risks diminishing the Union in its members' eyes. *See Small v. Avanti Health Sys.,* 661 F.23d 1180, 1191-92 (9th Cir. 2011).

### D.  Public Interest Favors the Issuance of SMART-TD's Requested Injunction.

Consistent with the primary purpose of the RLA to make and maintain agreements, and in furtherance of parties abiding by the law and agreements they make, public interest <u>strongly</u> favors <u>preserving</u> the status quo required by the RLA. *See, e.g., Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 238 F.3d 1300, 1308 (11th Cir.), *cert. denied,* 532 U.S. 1019 (2001) ("We note that in RLA cases a [party] need not show irreparable injury, a usual prerequisite for obtaining an injunction, to enjoin a violation of the *status quo* because of the strong public interest in enforcing the RLA."); *see also Union Pac. R.R. Co. v. Bhd. of Maint. of Way Employes Div. of Int'l Bhd. of Teamsters*, 509 F. Supp. 3d 1117, 1132 (D. Neb. 2020) (noting "public interest favors maintaining the status quo and avoiding major disruption to the nation's rail lines"); *Atlas Air,* 280 F. Supp. 3d at 105-06. The public interest does not favor an employer unilaterally imposing invasive requirements regarding terms and conditions of employment, especially where well-settled statutes provide that such issues be resolved in negotiations.

### V.  CONCLUSION

For the foregoing reasons, this Court should issue a preliminary injunction requiring the Railroads to bargain with the Union prior to implementing any changes to the terms and conditions of employment for represented employees.

15

Respectfully submitted,

/s/ Erika A. Diehl-Gibbons
Erika A. Diehl-Gibbons
Associate General Counsel
Kevin C. Brodar
General Counsel
Shawn M. McKinley
Assistant General Counsel
SMART-TD
24950 Country Club Blvd. Ste. 340
North Olmsted, OH 44070
Tel: (216) 228-9400
Fax: (216) 228-0937
ediehl@smart-union.org
kbrodar@smart-union.org

Robert E. Harrington, III
DUNN HARRINGTON LLC
22 W. Washington St., Suite 1500
Chicago, Illinois 60602
Tel: (773) 704-7088
reh@dhinjurylaw.com

Attorneys for SMART-TD

CERTIFICATE OF SERVICE

    I hereby certify that on this 12th day of November 2021, I caused the foregoing to be filed in this Court's CM/ECF system. I also certify that the foregoing document is being served via upon all attorneys of record via the CM/ECF system.

                                                        /s/ Erika A. Diehl-Gibbons
                                                        Erika A. Diehl-Gibbons