UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS, TRANSPORTATION DIVISION, | Civil Action Nos.: 21-cv-5506, 21-cv-5622, 21-cv-5502 |
| Plaintiff, | Judge |
| UNION PACIFIC RAILROAD COMPANY, et al., | |
| Defendant. | |

## **DECLARATION OF LUKE EDINGTON**

I, Luke V. Edington, pursuant to 28 U.S.C. § 1746, declare that the following facts are true and correct:

1.      I am the General Chairperson ("GC") of the Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART-TD") General Committee of Adjustment ("GCA") GO-953. I have served as a full-time employee of GO-953 as General Chairperson ("GC") since April 28, 2019. Prior to being GC, I served as First Vice GC of GCA GO-953 from May 25, 2015, until April 27, 2019. I understand this Declaration is being offered in support of SMART-TD's Memorandum in Support of their Motion for Preliminary Injunction. This Declaration is based on personal knowledge and I am competent to testify to the matter set forth herein.

2.      In accordance with SMART-TD's structure, the GCAs are the bodies with jurisdiction over "making and maintaining agreements," meaning negotiating collective-

bargaining agreements ("CBAs") and handling claims and grievances arising thereunder. As GC,

I am responsible for negotiating, interpreting, and enforcing the CBAs under my jurisdiction

between my GCA, or SMART-TD, and Union Pacific Railroad Company ("the Carrier" or

"UP"). As GC, I am familiar with the applicable local and national agreements, and various work

practices which have become an integral and implicit part of those agreements between SMART-

TD and UP. These agreements contain negotiated provisions on wages, leaves of absences, and

the process for medical disqualification.

3.      UP's rail system is separated into geographic divisions along its predecessor

carrier lines. I am the GC over the former Eastern, Pacific Northwest and C&NW divisions.

SMART-TD GCA GO-569, the subordinate body with jurisdiction over the former Alton &

Southern is located at 229 W. Grove St., Hershey, NE 69143. The GC of GCA GO-569 is T.L.

Dixon. SMART-TD GCA GO-577, the subordinate body with jurisdiction over the former

Missouri Pacific is located at 12200 Ambassador Dr. Ste. 236, Kansas City, MO 64163. The GC

of GCA GO-577 is R.E. Davis. (*Id.*). SMART-TD GCA GO-887, the subordinate body with

jurisdiction over the former HB&T, is located at 1775 Woodstead Ct., Ste. 202, Woodlands, TX

77380. The GC of GCA GO-887 is G.W. Crest. SMART-TD GCA GO-927, the subordinate

body with jurisdiction over the former SP-Western, is located at 500 Menlo Dr., Ste. 130,

Rocklin, CA 95765. The GC of GCA GO-927 is J.S. Chelette.

4.      On September 9, 2021, President Biden issued an executive order mandating that

certain federal contractors as defined therein mandate COVID-19 vaccines. A true and correct

copy of the Executive Order is attached as Exhibit 1. At no time did UP engage the SMART-TD

GCs regarding the vaccine mandate, nor attempt to engage in any bargaining over the matter, the

process, or related issues regarding the mandate. Rather, when questioned by SMART-TD GCs,

including myself, over whether UP intended to impose a vaccine mandate, UP repeatedly stated that its legal department was looking into the matter.

5.      Then, on Friday, October 8, 2021, after local managers informed many employees directly, UP General Director of Labor Relations Naomi Deines ("LR Dir. Deines") notified the SMART-TD GCs via email that Union Pacific, as a federal contractor, would comply with President Biden's vaccine mandate and medically disqualify any employee who was not fully vaccinated by December 8, 2021. LR Deines further asserted that action must be taken to implement the mandate by Monday, October 11, 2021, a mere three days later. A true and correct copy of that email is attached as Exhibit 2.

6.      I, along with the other SMART-TD GCs representing train service employees on UP, responded via letter on the same day, objecting to UP's action and belated notice. Said letter states, in pertinent part:

> Carrier has provided no information to the Organization prior to the notification sent on October 8th and is insistent that action must be taken by October 11, 2021. This compressed timeframe is an unrealistic window for information to be exchanged, or for meaningful discussions to occur between the parties.

We requested a conference call between the parties to discuss the matter and asked that UP provide information pertaining to the mandate. Finally, we asked for a postponement of the October 11, 2021, deadline to allow for a full discussion of the matter. A true and correct copy of that letter is attached as Exhibit 3.

7.      LR Dir. Deines responded to SMART-TD's letter via email on October 9, 2021, stating that Union Pacific would "be providing details to its employees about its compliance with [President Biden's executive order] on Monday, 10/11." The email further stated, [t]his communication will inform employees about the $300 incentive for any agreement employee who is fully vaccinated or has received an approved accommodation by 12/8." Finally, LR Dir.

Deines scheduled a conference on October 14, 2021, to "discuss the implementation of the vaccine mandate." A true and correct copy of that letter is attached as Exhibit 4. In a subsequent email on October 10, 2021, LR Dir. Deines re-scheduled the conference call from October 14, 2021, to October 11, 2021, the same day that UP was announcing its vaccine mandate to the workforce." A true and correct copy of that letter is attached as Exhibit 5.

8.     On October 22, 2021, the conference call was held between numerous UP management officials and the SMART-TD GCs, during which UP informed the SMART-TD GCs of some particulars of the vaccine mandate and answered some questions. During the call, UP merely reiterated the terms of the vaccine mandate, including its unilateral decision to pay vaccinated employees a $300 bonus, as well as its decision to medically disqualify employees who did comply with the vaccine mandate. Medical disqualification is a process that is historically subject to various CBAs between the parties. At no point during the conference call did any bargaining occur. Rather, at the time the call was held, UP had already announced the vaccine mandate to its workforce, including SMART-TD members.

9.     The payment of bonuses along with other modifications to existing agreements have always been a subject of bargaining between UP and SMART-TD, and such agreements have been reached as recently as March, November, and December 2020. A true and correct copy of those agreements, along with a proposed agreement from 2021, are attached as Exhibit 6.

10.     Similarly, the medical disqualification of employees is subject to terms contained in agreements between SMART-TD and UP, including the rights afforded to employees to challenge their alleged physical inability to perform their work. A true and correct copy of the CBA Rules on physical examinations is attached as Exhibit 7.

11.     Immediately following the conference call, via letter dated October 12, 2021, the SMART-TD GCs stated that while we recognize the seriousness of the COVID-19 pandemic and the federal government's action, UP could not institute the mandate and alter the current status quo between the parties without first bargaining in accordance with the processes contained in the Railway Labor Act. Accordingly, we requested a meeting to discuss the issue. A true and correct copy of that letter is attached as Exhibit 8. When UP did not respond to the letter, we sent another letter on October 14, 2021, stressing the seriousness of UP's unilateral action and again requested a meeting to discuss the issue. A true and correct copy of that letter is attached as Exhibit 9.

12.     On October 15, 2021, UP responded to SMART-TD's letters, stating that it is obligated to impose its vaccine mandate due to the executive order as it is a contractor of the federal government. A true and correct copy of that letter is attached as Exhibit 10.

13.     Conference calls between UP management officials and the SMART GCs were held on October 20, October 27, November 3, November 10, and November 11, during which UP would answer some questions posed by the GCs. Despite the GCs request that UP bargain over the implementation and effects of any vaccine mandate, UP has refused to date. A conference call was held on November 3, 2021, with the SMART-TD GCs present, along with Maqui Parkerson, Naomi Deines, Dr. Gillis, Brandt Hanquist, Health and Medical present for UP. During the call, UP informed the SMART-TD GCs that it would not medically disqualify employees who choose not to get vaccinated by December 8, 2021, and will allow them to continue working and will educate and counsel them on why they should get vaccinated. Despite backing off the initial pronouncements, at no point has UP bargained with the Union. During the call on November 11, UP advised that the vaccine deadline would be pushed to January 4, 2022.

UP additionally advised of its intended communication and process for dealing with unvaccinated employees who request an accommodation and those who do not. For employees who do not request an accommodation, UP intends to dismiss them if they do not respond within three weeks.

I declare under penalty of perjury that the following is true and correct to the best of my knowledge.

Executed this 12ᵗʰ day of November, 2021.

Luke V. Edington

BRIEFING ROOM

# Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors

SEPTEMBER 09, 2021 • PRESIDENTIAL ACTIONS

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 *et seq*., and section 301 of title 3, United States Code, and in order to promote economy and efficiency in procurement by contracting with sources that provide adequate COVID-19 safeguards for their workforce, it is hereby ordered as follows:

Section 1. Policy. This order promotes economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument as described in section 5(a) of this order. These safeguards will decrease the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government. Accordingly, ensuring that Federal contractors and subcontractors are adequately protected from COVID-19 will bolster economy and efficiency in Federal procurement.

Sec. 2. Providing for Adequate COVID-19 Safety Protocols for Federal Contractors and Subcontractors. (a) Executive departments and agencies, including independent establishments subject to the Federal Property and Administrative Services Act, 40 U.S.C. 102(4)(A) (agencies), shall, to the extent permitted by law, ensure that contracts and contract-like instruments (as described in section 5(a) of this order) include a clause that the contractor and any subcontractors (at any tier) shall incorporate into lower-tier subcontracts. This clause shall specify that the contractor or subcontractor shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance or Guidance), provided that the Director of the Office of Management and Budget (Director) approves the Task Force Guidance and determines that the Guidance, if adhered to by contractors or subcontractors, will promote economy and efficiency in Federal contracting. This clause shall apply to any workplace locations (as specified by the Task Force Guidance) in which an individual is working on or in

Ex. 1

connection with a Federal Government contract or contract-like instrument (as described in section 5(a) of this order).

(b)  By September 24, 2021, the Safer Federal Workforce Task Force (Task Force) shall, as part of its issuance of Task Force Guidance, provide definitions of relevant terms for contractors and subcontractors, explanations of protocols required of contractors and subcontractors to comply with workplace safety guidance, and any exceptions to Task Force Guidance that apply to contractor and subcontractor workplace locations and individuals in those locations working on or in connection with a Federal Government contract or contract-like instrument (as described in section 5(a) of this order).

(c)  Prior to the Task Force publishing new Guidance related to COVID-19 for contractor or subcontractor workplace locations, including the Guidance developed pursuant to subsection (b) of this section, the Director shall, as an exercise of the delegation of my authority under the Federal Property and Administrative Services Act, *see* 3 U.S.C. 301, determine whether such Guidance will promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors.  Upon an affirmative determination by the Director, the Director's approval of the Guidance, and subsequent issuance of such Guidance by the Task Force, contractors and subcontractors working on or in connection with a Federal Government contract or contract-like instrument (as described in section 5(a) of this order), shall adhere to the requirements of the newly published Guidance, in accordance with the clause described in subsection (a) of this section.  The Director shall publish such determination in the *Federal Register*.

(d)  Nothing in this order shall excuse noncompliance with any applicable State law or municipal ordinance establishing more protective safety protocols than those established under this order or with any more protective Federal law, regulation, or agency instructions for contractor or subcontractor employees working at a Federal building or a federally controlled workplace.

(e)  For purposes of this order, the term "contract or contract-like instrument" shall have the meaning set forth in the Department of Labor's proposed rule, "Increasing the Minimum Wage for Federal Contractors, " 86 Fed. Reg. 38816, 38887 (July 22, 2021).  If the Department of Labor issues a final rule relating to that proposed rule, that term shall have the meaning set forth in that final rule.

Sec. 3.  Regulations and Implementation.  (a)  The Federal Acquisition Regulatory Council, to the extent permitted by law, shall amend the Federal Acquisition Regulation to provide for inclusion in Federal procurement solicitations and contracts subject to this order the clause described in section 2(a) of this order, and shall, by October 8, 2021, take initial steps to implement appropriate policy direction to acquisition offices for use of the clause by recommending that agencies exercise their authority under subpart 1.4 of the Federal Acquisition Regulation.

(b)  By October 8, 2021, agencies shall take steps, to the extent permitted by law, to exercise any applicable authority to ensure that contracts and contract-like instruments as described in section 5(a) of this order that are not subject to the Federal Acquisition Regulation and that are entered into on or after October 15, 2021, consistent with the effective date of such agency action, include the clause described in section 2(a) of this order.

Sec. 4.  <u>Severability.</u>  If any provision of this order, or the application of any provision of this order to any person or circumstance, is held to be invalid, the remainder of this order and its application to any other person or circumstance shall not be affected thereby.

Sec. 5.  <u>Applicability.</u>  (a)  This order shall apply to any new contract; new contract-like instrument; new solicitation for a contract or contract-like instrument; extension or renewal of an existing contract or contract-like instrument; and exercise of an option on an existing contract or contract-like instrument, if:

(i)   it is a procurement contract or contract-like instrument for services, construction, or a leasehold interest in real property;

(ii)  it is a contract or contract-like instrument for services covered by the Service Contract Act, 41 U.S.C. 6701 *et seq*.;

(iii)  it is a contract or contract-like instrument for concessions, including any concessions contract excluded by Department of Labor regulations at 29 C.F.R. 4.133(b); or

(iv)  it is a contract or contract-like instrument entered into with the Federal Government in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public;

(b)  This order shall not apply to:

(i)   grants;

(ii)  contracts, contract-like instruments, or agreements with Indian Tribes under the Indian Self-Determination and Education Assistance Act (Public Law 93-638), as amended;

(iii)  contracts or subcontracts whose value is equal to or less than the simplified acquisition threshold, as that term is defined in section 2.101 of the Federal Acquisition Regulation;

(iv)  employees who perform work outside the United States or its outlying areas, as those terms are defined in section 2.101 of the Federal Acquisition Regulation; or

(v)   subcontracts solely for the provision of products.

Sec. 6.  <u>Effective Date.</u>  (a)  Except as provided in subsection (b) of this section, this order is effective immediately and shall apply to new contracts; new contract-like instruments; new solicitations for contracts or contract-like instruments; extensions or renewals of existing contracts or contract-like instruments; and exercises of options on existing contracts or contract-like instruments, as described in section 5(a) of this order, where the relevant

contract or contract-like instrument will be entered into, the relevant contract or contract-like instrument will be extended or renewed, or the relevant option will be exercised, on or after:

(i)  October 15, 2021, consistent with the effective date for the action taken by the Federal Acquisition Regulatory Council pursuant to section 3(a) of this order; or

(ii)  for contracts and contract-like instruments that are not subject to the Federal Acquisition Regulation and where an agency action is taken pursuant to section 3(b) of this order, October 15, 2021, consistent with the effective date for such action.

(b)  As an exception to subsection (a) of this section, where agencies have issued a solicitation before the effective date for the relevant action taken pursuant to section 3 of this order and entered into a new contract or contract-like instrument resulting from such solicitation within 30 days of such effective date, such agencies are strongly encouraged to ensure that the safety protocols specified in section 2 of this order are applied in the new contract or contract-like instrument.  But if that contract or contract-like instrument term is subsequently extended or renewed, or an option is subsequently exercised under that contract or contract-like instrument, the safety protocols specified in section 2 of this order shall apply to that extension, renewal, or option.

(c)  For all existing contracts and contract-like instruments, solicitations issued between the date of this order and the effective dates set forth in this section, and contracts and contract-like instruments entered into between the date of this order and the effective dates set forth in this section, agencies are strongly encouraged, to the extent permitted by law, to ensure that the safety protocols required under those contracts and contract-like instruments are consistent with the requirements specified in section 2 of this order.

Sec. 7.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

JOSEPH R. BIDEN JR.

THE WHITE HOUSE,

September 9, 2021.

| | |
|---|---|
| **From:** | Naomi Deines <NHLESCEL@UP.COM> |
| **Sent:** | Monday, October 11, 2021 4:46 PM |
| **To:** | bpc@bletupwl.org; clambert@bleted.org; garycrest; genchairupcr@gmail.com; jloganjr@bletsr.org; ledington; Roy Davis; Recrow@bletupnr.net; scottutue; Steve_leyshon@wrgca.com; Terry.Dixon@smart-union569.org |
| **Subject:** | FW: Union Pacific Is Complying With Federal Vaccine Mandate |
| **Importance:** | High |

General Chairpersons,
Below is the information that went out TE&Y.

-Naomi
-----------------------------------------------------------------------------

Union Pacific team,

Today we announced Union Pacific is complying with the executive order mandating employees of federal contractors be fully vaccinated by Dec. 8. As a federal contractor who ships goods supporting our nation's armed services, UP is fulfilling this federal requirement.

Along with being our best defense against severe COVID-19 illness, vaccines are our best path forward out of the pandemic. Vaccine mandates are not unique to UP – many companies, schools and private businesses require vaccines.

Please read the UPOnline article published today and view its accompanying video so you're aware of the actions required on your part. This includes reporting your vaccination status by updating the 'My Profile' tab in SAP, as demonstrated in this RailFlix video – the entire process takes less than five minutes.

Any employee who responds 'No, I have not been vaccinated' has an opportunity to apply for an accommodation for medical or religious reasons.

To be considered fully vaccinated by the deadline, you must receive the final dose (second dose of Pfizer-BioNTech or Moderna; or one dose of Johnson & Johnson/Janssen) on or before Nov. 23.

We've compiled state-specific COVID-19 vaccine information to help you locate a place in your local community to receive your vaccination, as well as updated our COVID-19 webpage with a variety of resources to help make this process as easy as possible:

- Information about the COVID-19 vaccine itself, including a Vaccine FAQ (more information is available from the CDC).

- A COVID-19 Vaccine Mandate and Reporting FAQ – it's important to fully review and understand all details.

- SAP Vaccine Reporting Quick Reference Guides (QRGs).

- Instructions for submitting medical or religious accommodation forms.

As incentive to report your vaccination status in the 'My Profile' tab in SAP, nonagreement employees will receive a vacation incentive and agreement professionals will be offered incentive pay.

Ex. 2

Thank you in advance for taking action as soon as possible before the Dec. 8 deadline – you play a critical role ensuring our railroad complies with this federal mandate.

Thank you,

Beth Whited
Executive Vice President and Chief Human Resource Officer

This email and any attachments may contain information that is confidential and/or privileged for the sole use of the intended recipient. Any use, review, disclosure, copying, distribution or reliance by others, and any forwarding of this email or its contents, without the express permission of the sender is strictly prohibited by law. If you are not the intended recipient, please contact the sender immediately, delete the e-mail and destroy all copies.



International Association of Sheet Metal, Air, Rail and Transportation Workers

## Transportation Division

### General Committees of Adjustment
Union Pacific Railroad Company

October 8, 2021

<u>via email only</u>

Ms Naomi Deines
General Director - Labor Relations
Union Pacific Railroad Company
1400 Douglas St
Omaha, NE 68179

Ms Dienes,

We are in receipt of your email dated October 8, 2021, wherein you notified the Organization that Union Pacific would comply with the COVID 19 vaccine mandate and medically disqualify any employee who did not comply by December 8, 2021.

As in typical fashion, Carrier has provided no information to the Organization prior to the notification sent on October 8th and is insistent that action must be taken by October 11, 2021. This compressed timeframe is an unrealistic window for information to be exchanged, or for meaningful discussions to occur between the parties. Furthermore, your reference to "discussions" is confusing as you have failed to schedule a meeting or conference call with our offices.

We respectfully request that Carrier postpone the October 11, 2021, deadline and schedule a conference call between the parties as soon as possible. We also request that Carrier provide our offices with a copy of the Federal Mandate and a detailed synopsis of Carrier's implementation/facilitation plan prior to the call. We cannot, in good faith, make any commitment on this complex and controversial issue until such occurs.

Sincerely,

*Roy Davis*

Roy Davis
General Chairperson
GO-577

*Terry Dixon*

Terry Dixon
General Chairperson
GO-569

*Luke Edington*

Luke Edington
General Chairperson
GO-953

*Scott Chelette*

Scott Chelette
General Chairperson
GO-927

*Gary Crest*

Gary W. Crest
General Chairperson
GO-887

Ex. 3

Act Now: Union Pacific Is Complying With Federal Vaccine Mandate
Workforce Resources
Act Now: Union Pacific Is Complying With Federal Vaccine Mandate
High
10/11 12:47
11/10 12:39

After reviewing the White House's COVID-19 vaccine mandates, Union Pacific is complying with the executive order mandating employees of federal contractors be fully vaccinated by Dec. 8. As a federal contractor who ships goods supporting our nation's armed services, UP is fulfilling this federal requirement.

"Along with being our best defense against severe COVID-19 illness, vaccines are our best path forward out of the pandemic," said Beth Whited, executive vice president and chief human resource officer. "Vaccine mandates are not unique to UP – many companies, schools and private businesses require vaccines."

**Report Your Vaccination Status by Dec. 8**

To comply with the federal mandate, every UP employee is required to report their vaccination status by updating the 'My Profile' tab in SAP, as demonstrated in this RailFlix video – the entire process takes less than five minutes. Vaccine statuses will remain confidential, disclosed only on a need-to-know basis.

Any employee who responds 'No, I have not been vaccinated' has an opportunity to apply for an accommodation for medical or religious reasons. Previously approved business travel accommodations must be resubmitted to be approved under the new federal mandate.

Those without an approved accommodation must be fully vaccinated by the Dec. 8 deadline. This means employees must receive the final dose (second dose of Pfizer-BioNTech or Moderna; or one dose of Johnson & Johnson/Janssen) on or before Nov. 23.

UP has compiled state-specific COVID-19 vaccine information to help employees locate a place in their local communities to receive their vaccination. Employees should arrange to receive their vaccination outside of work as soon as possible; agreement employees unable to do so may follow the standard process to lay off using HP status. Please note weekly testing is not available as an alternative option, as the federal requirement mandates employees be fully vaccinated.

As incentive to report and provide proof of vaccination status in the 'My Profile' tab in SAP:

- Agreement employees will be offered a $300 incentive for all who comply with UP's efforts to implement the federally-imposed vaccine mandate. UP is in discussions with the organizations who represent our unions regarding our implementation efforts.

These incentives, available through the end of 2021 regardless of when employees receive and report their vaccination, replace the previous swag incentive program. Swag orders received by

Ex. 4

12 p.m. CT today still will be fulfilled; after this time, the program will be discontinued. Please note any employee who submitted their COVID-19 attestation to receive swag still is required to report their vaccination status in SAP by Dec. 8.

Those who do not report their vaccination status by the deadline will be subject to disciplinary action, up to and including nonagreement employee termination or agreement employee medical disqualification. Additionally, providing false documentation will result in termination.

**Have Questions? We've Got Answers**

You're busy building America – that's why we're trying to make this process as easy as possible.

We've updated UP's [COVID-19 webpage](#) with a variety of resources under the **'Vaccine Information'** section, including:

- Information about the COVID-19 vaccine itself, including a Vaccine FAQ (more information is [available from the CDC](#)).
- A COVID-19 Vaccine Mandate and Reporting FAQ – it's important to fully review and understand all details.
- SAP Vaccine Reporting Quick Reference Guides (QRGs).
- Instructions for submitting medical or religious accommodation forms.

Contact WR with questions about reporting your vaccination status by [creating a TRM ticket](#) – select the 'COVID-19 Vaccine' category and the 'Verification and Reporting Process' topic.

If you get locked out of your SAP 'My Profile', click 'Unlock Personnel Number' from the top left side of the page. All other SAP technical issues should be directed to OSS



Vaccine Mandate
Jeremy Givens
Vaccine Mandate
High
10/11 14:35
11/10 14:33

Good Afternoon Greatest Plains Railroaders,

I am attaching some news recently released on UP Online. I wanted to send you a notice so you could get the info as quickly as possible as time is of the essence. After reviewing the White House's COVID-19 vaccine mandates, Union Pacific is complying with the executive order mandating employees of federal contractors be fully vaccinated by Dec. 8. As a federal contractor who ships goods supporting our nation's armed services, UP is fulfilling this federal requirement.

To comply with the federal mandate, every UP employee is required to report their vaccination status by updating the 'My Profile' tab in SAP, as demonstrated in this RailFlix video – the entire process takes less than five minutes. Vaccine statuses will remain confidential, disclosed only on a need-to-know basis.

Any employee who responds 'No, I have not been vaccinated' has an opportunity to apply for an accommodation for medical or religious reasons.

Those without an approved accommodation must be fully vaccinated by the Dec. 8 deadline. This means employees must receive the final dose (second dose of Pfizer-BioNTech or Moderna; or one dose of Johnson & Johnson/Janssen) on or before Nov. 23.

UP has compiled state-specific COVID-19 vaccine information to help employees locate a place in their local communities to receive their vaccination. Employees should arrange to receive their vaccination outside of work as soon as possible; agreement employees unable to do so may follow the standard process to lay off using HP status. Please note **weekly testing is not available as an alternative option**, as the federal requirement mandates employees be fully vaccinated.

As incentive to report and provide proof of vaccination status in the 'My Profile' tab in SAP:

- Agreement employees will be offered a $300 incentive for all who comply with UP's efforts to implement the federally-imposed vaccine mandate. UP is in discussions with the organizations who represent our unions regarding our implementation efforts.

Incentive is available through the end of 2021 regardless of when employees receive and report their vaccination

Those who do not report their vaccination status by the deadline will be subject to disciplinary action, up to and including nonagreement employee termination or agreement employee medical disqualification. Additionally, providing false documentation will result in termination.

Have Questions? We've Got Answers

You're busy building America – that's why we're trying to make this process as easy as possible.

We've updated UP's COVID-19 webpage with a variety of resources under the 'Vaccine Information' section, including:

- Information about the COVID-19 vaccine itself, including a Vaccine FAQ (more information is available from the CDC).
- A COVID-19 Vaccine Mandate and Reporting FAQ – it's important to fully review and understand all details.
- SAP Vaccine Reporting Quick Reference Guides (QRGs).
- Instructions for submitting medical or religious accommodation forms.

Still have questions about reporting your COVID-19 vaccination status? Contact Workforce Resources by creating a TRM ticket – select the 'COVID-19 Vaccine' category and the 'Verification and Reporting Process' topic.

If you get locked out of your SAP 'My Profile', click 'Unlock Personnel Number' from the top left side of the page. All other SAP technical issues should be directed to OSS.

Thank you

Jeremy Givens

As always I have an open door policy and if you all have any quesitons or need help please do not hesitate to reach out to your maanger, union rep or myself. My Cell number is 402-659-6237 if you need to reach me more directly



Operating also sent out notificaiton after everyone else did, here's their message:



General Chairpersons,

Thank you for the letter you sent via email on Friday. Our emails must have crossed, as you have by now received the email that I sent just before getting yours, with the EO and the Guidance related to the vaccine mandate for federal contractors. Union Pacific will be providing details to its employees about its compliance with the EO on Monday, 10/11.  This communication will inform employees about the $300 incentive for any agreement employee who is fully vaccinated or who has received an approved accommodation by 12/8.  As requested, we are scheduling a conference call on Thursday, October 14th at 15:30 CST so we can discuss the implementation of the vaccine mandate.

Thank you,

Naomi H. Deines - Gen Dir - Labor Relations | Union Pacific Railroad | 1400 Douglas St | Omaha, NE 68179 | (O):402.544.2649 | (C): 402.238.5954 | nhlescel@up.com

Ex. 5

**Letter of Understanding**

**Between**

**UNION PACIFIC RAILROAD COMPANY**

**And**

**SMART TRANSPORTATION DIVISION**
**GCA - 953**

**2020 Employee Bonus**

With the public health crisis related to Covid-19 ("the novel Coronavirus"), Union Pacific employees have been dedicated to work through these unprecedented times and ensure that our service to our customers has not been impacted. In appreciation, Union Pacific will pay a one-time 2020 bonus to all eligible agreement employees. Accordingly, it is agreed the following will apply:

(1) Consistent with all applicable laws, the Carrier will pay all active and eligible employees covered by this Agreement, a one-time bonus of $1000 gross (tax obligation will be deducted).

    a. An eligible employee is defined as an employee that has performed 30 or more days of compensated service or mileage/starts equivalent (not including LV, PL, jury duty etc) for Union Pacific Railroad under their respective collective bargaining agreement starting March 1, 2020 through November 30, 2020. If an employee has performed service in multiple crafts, duplicate payments will not be allowed.

    b. This includes active, on leave or suspension, and furloughed employees. This does not include any other statuses such as promoted to non-agreement after March 1, 2020 or retired or in terminated status as of November 30, 2020.

(2) The bonus is considered a one-time, lump sum payment as a "Thank You" for diligently working due to the novel Coronavirus and is not intended to offset any other payments due to eligible employees now or in the future under any other agreement. Without limiting the foregoing, the payment described herein is not intended as compensation paid in full or partial settlement of the parties' pending section 6 notices, and any agreement on compensation reached in settlement of those notices will be separate from this Agreement.

(3) The payment will be made to eligible employees no later than December 20, 2020.

(4) This Agreement will not be referred to by any party in any ongoing or future section 6 negotiations or in any arbitral, judicial, or administrative forum.

Ex. 6

Employee Bonus                                                                                    Page 2

(5) This Agreement may be changed only by the mutual consent of the parties. The Carrier's
determinations with respect to the bonus payments described herein, including without limitation
eligibility for such bonus payments, shall be considered final and binding and shall in all respects
be conclusive on the parties hereto.

(6) This Agreement must be signed and returned to the Highest Designated Officer no later than
November 20, 2020 to be considered valid and allow time for the Carrier to process the payments.
This agreement expires on January 31, 2021.

Signed this _13_ day of _November_ 2020.

**FOR THE ORGANIZATION:**                             **FOR THE CARRIER:**

Luke Edington                                         Jennifer Powell
General Chairman - GCA 953                            Director - Labor Relations



December 9, 2020

Mr. Luke Edington
General Chairman – SMART TD
5990 SW 28th Street #F
Topeka, KS 66614

RE: 2020 Employee Bonus LOU Side Letter

Dear Mr. Edington,

     This is in reference to the 2020 Employee Bonus LOU dated November 19, 2020. Specifically, the Carrier proposes amending the eligibility criteria referred to in Section 1(b). This amendment is to include employees who have passed away following meeting the eligibility criteria and who had not retired or terminated their employment prior to passing away. This would include individuals who were furloughed or went on a leave of absence following meeting the criteria before they passed away. It does not include employees who retired or terminated and then passed away. The Carrier would pay the $1000 bonus payment to their designated heirs/family members/beneficiaries. All other provisions of the LOU would apply as indicated to these deceased employees' payments.

     If you agree, please signify your concurrence by signing below.

Sincerely,

Jennifer Powell
Director - Labor Relations

Terrill L. Maxwell

Terrill Maxwell
Director – Labor Relations

I concur:

Luke Edington    General Chairman

UNION PACIFIC RAILROAD
1400 Douglas Street, 7th Floor
Omaha, Nebraska 68179

Jennifer Powell
Labor Relations

P 402 544 7163
C 402 210 3740
E jepowell@up.com

Memorandum of Agreement

Between the

UNION PACIFIC RAILROAD

And the

SMART TRANSPORTATION DIVISION

(UP Eastern District, Northwest District and former CNW)

---

Pool Freight Hold Turn for COVID-19 Vaccine Lay Offs

---

With the public health crisis related to Covid-19 ("the novel Coronavirus") it has been proposed by the Carrier to allow trainmen in pool freight service to hold their turn if it is necessary to mark off in order to receive the Covid-19 vaccine. Accordingly, it is agreed:

1. Should a trainman who holds a turn in pool freight lays off in "PH" status in order to obtain a Covid-19 vaccine, such trainman will continue to hold his/her turn.

2. If the pool turn becomes first out, the turn/position will remain first out until the employee resumes duty. Upon mark up and subject to call the employee will be called at the home terminal from his/her first out position.

3. No penalty claims shall be presented against the Company in the application of this agreement.

4. This agreement may be cancelled by either party by serving ten (10) day written notice upon the other.

   Signed this _____ day of _____.

For the SMART-TD:                                    For the Union Pacific Railroad:


_____                    _____
Luke Edington                                       Jennifer Powell
General Chairman, SMART TD                           Director – Labor Relations


                                                    _____
                                                    Beth Wilderman
                                                    Director, Labor Relations

 **BUILDING AMERICA®**

March 23, 2020

Mr. Luke Edington
General Chairman – SMART TD
5990 SW 28th Street #F
Topeka, KS 66614

RE: COVID-19 Temporary Agreement

Dear Mr. Edington,

With the current global crisis related to the COVID-19 pandemic, the parties have agreed to make the following modifications on agreements governed by the SMART Transportation General Committee 953 in order to provide a safe working environment while maintaining train operations.  Accordingly it is agreed:

### SENIORITY MOVES

Rules pertaining to timelines associated with seniority moves are temporarily modified as follows:

I.   While this temporary agreement is in effect, employees will not be permitted to make a voluntary seniority move from the assignment/board they are currently assigned on the effective date of this agreement except for the following:

   A.   Permanent vacancies that are created by what is known to be an extended absence (excluding vacation) due to medical leave or medical status will be immediately filled (on the first day) by the senior trainman with an application/bid on file.

   B.   At the expiration of the medical leave, the employee returning to work will immediately be placed back on their assignment and the displaced trainmen will be allowed to make a seniority move in accordance with the Schedule of Rules.

   NOTE: This provision will not take effect until 2 calendar days after the agreement is signed by both parties.  The intent is to allow employees the opportunity to make a final seniority move in accordance with existing schedule rules and agreements.

II.  The parties recognize they may need to address other specific situations that may occur during an emergency and they will work together to resolve them amicably.

### TEMPORARY AGREEMENT TRAINING BOARD (TATB)

**UNION PACIFIC RAILROAD**
1400 Douglas Street, 7th Floor
Omaha, Nebraska 68179

**Jennifer Powell**
Labor Relations

P 402-544-7163
C 402-210-3740
E jepowell@up.com

Union Pacific may, at its discretion, establish temporary TATB boards at the following Hubs/Zones consistent with the terms and conditions outlined in this agreement.

Zone 200
Denver Hub
Salt Lake Hub
Portland Zone 1
Portland Zone 3

I.   Placement to TATB

   A.   Mandatory placement to a TATB board will be restricted to trainmen who are unable, through the normal exercise of seniority, to hold a train or yard service position in their Hub/Zone.  No trainmen will be furloughed while this LOU is in effect, but will instead be placed on the TATB.

      1.   CMS will notify an employee once they are no longer able hold a train or yard service position of their placement to the TATB or, in areas not covered by TATB, to the AWTS or CRTB.

         **NOTE**: TATB will not be afforded to trainmen who are in a borrowed out or leave of absence status.

         **NOTE**:  This will also apply to Hubs/Zones who are not listed above but currently have AWTS/CRTB boards in place.  Caps on those boards will be removed while this LOU is in effect.

   B.   TATB Boards, where maintained, will be the first source of supply to recall trainmen in seniority order to fill full-time positions prior to recalling furloughed trainmen.

   C.   TATB trainmen may not bid to other TATB territories nor will they be entitled to bid on regular assignments.

II.   Availability and Guarantee

   A.   TATB employees will be required to be available to work eight (8) days per month which may also require them to work additional days in order to complete a tour of duty/return to his/her home terminal.

   B.   TATB employees may be used on their designated workdays for any work or training assignments required however, they may only be used once all vacancy procedures have been exhausted and not treated as a secondary/supplemental extra board.

      **NOTE**: Carrier will staff extra boards as to avoid the use of Trainmen on the TATB, AWTS and CRTB boards and ensure that reasonable lay-off privileges, personal leave opportunities and vacation requests are granted.

C. TATB employees will be guaranteed a minimum of eight (8) days pay, at the applicable foreman basic daily rate, per month so long as the employee performs all work and training for which called or is available for service on his/her schedule days.

> **NOTE:** In the event a TATB employee is called on their designated or non-designated workday as a conductor/foreman but does not perform service, he or she will not be considered as unavailable as provided in Paragraph C above.

D. The obligation by an employee in TATB to be available for work and/or training on a designated work day is not affected or altered by that employee if they are used in emergency service on a non-designated work day. The performance of such work by this employee in TATB will not alter in any manner his or her obligations as an employee in TATB or change his or her designated work days..

1. The earnings made by an employee in TATB on a non-designated work day will not be used to offset his or her TATB guarantee.

   NOTE: It is not the intent to use employees on the TATB on their non-designated work day. If issues arise where employees assigned to the TATB are used on their non-designated work days, it will immediately be addressed between the General Chairman and the Director of Labor Relations.

E. An employee on the TATB will be allowed to observe unused personal leave or single days of vacation.

F. An employee on the TATB will be allowed to observe his or her scheduled weeks of vacation if his or her vacation was scheduled prior to accepting the TATB option.

1. A TATB employee who observes his/her scheduled vacation in accordance with this section above will have his/her monthly guarantee offset by his/her vacation earnings should they fall on a designated work/training day.

2. A TATB employee who observes his/her scheduled vacation in accordance with this section will not have his/her monthly guarantee offset by his/her vacation earnings should they fall on other than a designated work/training day.

G. TATB employees in the Hubs/Zone identified herein will not be required to work and/or train outside of their respective TATB location.

NOTE: Unless otherwise modified by this agreement, current AWTS and CRTB agreements continue to apply.

III. Handling of Furlough Status

A. When it is necessary to recall an employee from furloughed status, the senior furloughed trainman within the Hub/Zone will be recalled and assigned to a permanent vacancy within 48 hours if possible.

B. If an employee is unable to return within 48 hours, they will return as early as possible, not exceeding 15 days.

C. Employees who are recalled from furloughed will work no less than 15 days before being placed in furlough status again.

## GENERAL PROVISIONS

I. Health and Welfare benefits will be provided in accordance with applicable agreements.

II. The terms and conditions of this Agreement, general and specific, shall not be applied, or interpreted to apply, to other locations or territories, will not prejudice the position of either party and will not be referred to in connection with any other case, agreement, court proceeding and or dispute resolution. Unless specifically modified by the letter of understanding, the provisions of current agreements remain in effect.

III. It is understood no claims will be filed or progressed regarding the interpretation or application of this temporary understanding. During this period, should there be a dispute, it will be handled promptly between the highest designated Labor Relations Officer and the General Chairman.

IV. This understanding will automatically terminate April 30, 2020; however either party may cancel prior to the expiration date with a 48 hour written notice served upon the other. The parties will promptly meet (via telephone or video conference) to discuss the cancellation notice within 48 hours of the notice being served. Additionally, the parties may mutually agree to extend this temporary understanding if necessary.

Effective this **23**ʳᵈ day of March, 2020

Sincerely,

Jennifer Powell
Director - Labor Relations

I Concur:

Luke Edington
General Chairman SMART-TD

3-23-20
Date

C O P Y

MEMORANDUM AGREEMENT BETWEEN THE
CHICAGO AND NORTH WESTERN RAILWAY
COMPANY AND BROTHERHOOD OF RAILROAD
TRAINMEN IN RESPECT TO PROCEDURE
TO BE FOLLOWED PERMITTING EMPLOYES
TO APPEAL FROM THE COMPANY DOCTOR'S
DECISION WHERE AN EMPLOYE COMING
WITHIN THE SCOPE OF THE TRAINMEN'S
SCHEDULE HAS BEEN TEMPORARILY OR
PERMANENTLY PHYSICALLY DISQUALIFIED
FOR SERVICE WITH THE RAILWAY COMPANY.

It is hereby agreed that in the event of a dispute
arising from the temporary or permanent disqualification
for service by the Railway Company's Medical Department
of an employe coming within the scope of this agreement,
and the employe desires to appeal from the findings and
decision of the Medical Department, upon mutual agree-
ment between the Officer in Charge of Personnel and the
General Chairman arrangements will be made for the employe
to be examined by a panel of three doctors, one to be
selected by the Railway Company, one to be selected by
the employe or his representative, and the third to be
selected by the other two. The findings and decision of
the panel, or a majority of the panel, will be binding
on all parties at interest. The Railway Company and
the organization will assume the fees and expenses of
their respective doctors, the fee and expenses of the
third doctor to be divided equally between the Railway
Company and the organization.

The foregoing will be considered a part of current
trainmen's schedule effective July 1, 1944 and subject
to concluding paragraph thereof.

FOR THE BROTHERHOOD OF      FOR THE CHICAGO AND NORTH
RAILROAD TRAINMEN:         WESTERN RAILWAY COMPANY:

(S) O. G. Jones            (S) G. F. Stephens
     General Chairman           Director of Personnel

(S) J. H. Whaley
     Secretary, G.G.C.

Chicago, Illinois
August 13, 1948

Ex. 7

MEMORANDUM OF AGREEMENT

BETWEEN

BROTHERHOOD OF LOCOMOTIVE ENGINEERS

AND

CHICAGO AND NORTH WESTERN RAILWAY COMPANY

— — — —

## PHYSICAL EXAMINATIONS

Effective March 15, 1969, the following will govern with respect to physical examinations:

Section (a)  In the event an employe is required by Carrier's instructions to travel to a point away from the home terminal of his assignment for a physical examination, he shall be paid the earnings of his assignment.  If no earnings are lost on such days he shall be paid a minimum day for each day involved in going to the point of examination, obtaining same, and returning from such examination.

It is understood that an employe assigned at an outside location, maintaining his residence in the home terminal and examined at the home terminal, or an employe assigned at home terminal, on his off days, will be entitled to pay on the minute basis from the time he reports for the examination until the examination is completed, with a minimum of two (2) hours and a maximum of 8 hours pro rata. If required to report for examination on other than his off days at his home terminal, the employe will be paid lost earnings.  It is understood the employe is only paid in those circumstances where he passes the physical examination and is able to perform service.

Section (b)  An employe held out of service as the result of an examination or re-examination requested by the carrier will, upon request of the employe involved, be promptly furnished with a copy of the examining physician's findings and diagnosis.

Section (c)  When a working employe is held out of service by the company and required to undergo physical examination and it is found in the opinion of the examining physician that he is unable to perform service, if the employe questions that diagnosis he will be privileged to have a physician of his own choosing to examine him.  In case of disagreement between his physician and the

- 2 -

physician representing the company, they shall select a neutral
physician within a reasonable period, not exceeding 15 days from the
date the employe is disqualified, and the decision of the majority
of the three will be final.  The three physicians will examine the
employe and render a report of their findings within a reasonable
time, not exceeding 15 days after their selection, setting forth
the employe's physical condition and their conclusions as to
whether he meets the requirements of the Company's physical examina-
tion rules.  The 15-day periods mentioned above may be extended
through mutual agreement between the General Chairman and the
Vice President-Labor Relations.  If it is determined by the
majority that the employe's condition did not warrant his being
held from service, he will be returned to service and paid for all
time lost.  The railroad company and the employe involved will each
defray the expense of their respective physicians.  The fee of the
third member of the board, not exceeding $100 will be borne
equally by the employe involved and the railroad company.  Other
examination expenses, such as X-ray, electrocardiographs, etc., not
exceeding $100, will be borne equally by the employe involved and
the railroad company.

   Section (d)  Should the decision of the board of physicians
be adverse to the employe and he considers that his physical
condition has improved sufficiently to justify considering his re-
turn to service, a re-examination will be arranged upon request of
the employe, or his representative, but not earlier than ninety
(90) days after such decision, nor oftener thereafter than each
ninety (90) days.

   Section (e)  If an employe has not been working due to illness
or injury, and upon his advising the company that he desires to
return to work, and the company holds him out of service to undergo
a physical examination, the provisions of (a) through (d) above
shall apply.  An employe who has been off for a period of 30 days
or more will, when required by the carrier, submit himself for a
physical examination before returning to work without compensation.

   Section (f)  It is further understood that the provisions of
this agreement do not apply to annual physical examinations or
periodic re-examinations because of chronic conditions where
employes are examined more frequently.

This agreement is in full and final disposition of the organization's
notice for changing and amending the existing agreements, served
January 5, 1968.

- 3 -

    This agreement shall become effective March 15, 1969 and shall continue in effect until changed or modified in accordance with the Railway Labor Act, as amended.


FOR THE BROTHERHOOD OF
LOCOMOTIVE ENGINEERS:

_A. R. Maggio_
General Chairman


APPROVED:

_B. N. Whitmire_
Asst. Grand Chief Engr.


Chicago, Illinois

March 14, 1969

FOR THE CHICAGO AND NORTH
WESTERN RAILWAY COMPANY:

_A Emyles_
Assistant Vice President-
Labor Relations


APPROVED:

_J. Dwefa_
Vice President-Labor Relations

Case 1:21-cv-05562 Document #: 42-2 Filed: 11/12/21 Page 33 of 44 PageID #:524

14. (a) **APPLICATIONS FOR EMPLOYMENT.**
Applications of yardmen and switchtenders for employment, if not satisfactory, will be rejected within thirty days after first service, or applicant will be considered accepted.

14. (b) **PHYSICAL EXAMINATIONS.** All physical examinations of applicants shall be made without expense to the person examined, unless he shall pass such examination and be continued in service not less than thirty days. The entire fee for such examination shall not exceed one dollar ($1.00). The applicant shall be notified within ten days of the result of his physical examination, and if not so notified he will be considered physically qualified.

15. (a) **LEAVING SERVICE.** Yardmen or switchtenders leaving the service of the Company of their own accord forfeit all seniority rights and shall not be reinstated.

15. (b) **SERVICE LETTER.** Any yardman or switchtender leaving the employ of the Company will, at his request, be given a letter by the superintendent stating his term of service and capacities in which employed.

15. (c) **LEAVE OF ABSENCE.** A yardman or switchtender will not be granted leave of absence for a longer period than ninety days, except in case of sickness of himself or member of his family, or when serving on committee.

16. (a) **TEMPORARY VACANCIES—SWITCH-TENDERS—FILLING OF.** In filling temporary vacancies of switchtenders, and no extra switchtenders available, the senior available extra yardman will be given preference.

16. (b) **PERMANENT VACANCIES—SWITCH-TENDERS—FILLING OF.** In filling vacancies in positions of switchtenders, preference shall be given to yardmen disabled in the service, whenever such injuries are not such as to unfit them for such duties. Disabled

yardmen desiring to be considered in line for such positions may file application with the proper officer of the Company.

17. **TIME SLIP CORRECTION.** When the time of men is corrected or disallowed, they will be notified of the fact at once by the superintendent; such notice to show reason why time was not allowed, referring to the rule in the agreement and advise by whose authority change was made. Time tickets will be issued upon request for shortage of eight hours or more.

18. **PAYMENT OF NOTARY FEES.** When the Company requires that official papers shall be certified by a Notary Public or other court officer, it shall pay the fee assessed by such officers.

19. **SERVING ON COMMITTEE.** Yardmen or switchtenders serving on committees will be granted leave of absence, upon request, to serve on such committees.

20. **CABOOSES FURNISHED.** Yardmen will be furnished cabooses in transfer service, also on other extended runs justifying having cabooses. A yard crew shall be permitted to switch the caboose required by this rule to the rear end of the train before commencing a transfer or other extended movement. Cabooses will be equipped with stoves, tools, signal appliances, lamps and such other supplies as are required for the service. Present practice of drawing supplies to continue.

21. (a) **EQUIPMENT OF ENGINES IN YARD SERVICE.** All engines assigned to switching service shall be equipped with headlights, footboards and proper safety appliances at both ends.

An engine temporarily assigned to switching service shall be so equipped at the first opportunity, if such engine is to be continued in that service more than one shift. The use of engines not so equipped shall not be prolonged by the substitution of one engine for another. This provision, however, shall not apply to engines exclusively used in transfer service.

21. (b) Engines that blow steam, so as to obstruct the observation of signals, shall not be used in yard service.

**LEAVE OF ABSENCE ACCOUNT REDUCTION IN FORCE.**

94. (b) Conductors laid off on account of decrease in business will be granted leave of absence if they so desire, provided same can properly be granted in the opinion of the Superintendent, it being understood when such leave of absence is granted, conductors may resume work and retain their original rank if they report for duty before the expiration of leave of absence and there is work for them. (See Question 43)

94. (c) Conductors laid off account reduction in force will be permitted to reenter service in the order of their turn and retain their original rank without loss of seniority acquired prior to time laid off; it being understood they will keep the proper railway officer advised of their address, or change of address, and must report for service within fifteen days from receipt of notification to return to work, unless prevented by sickness, otherwise their names will be removed from the seniority roster.

**LOCATION OF CREW BOARDS.**

95. Where crew boards are maintained, they will be located where they can be inspected.

**LEAVE OF ABSENCE.**

96. A conductor having been absent of his own accord to exceed six consecutive months, thereby forfeits all rights with the Company, except in case of sickness, or when leave of absence has been granted. No leave of absence will be granted to exceed one year, except in case of sickness, or when serving as chairman of a General Committee.

**CHANGE OF RESIDENCE, FREE TRANSPORTATION.**

97. When change of division or train runs require conductors to change their place of residence, they will be furnished free transportation for their families and household goods.

**PERMISSION TO LAY OFF.**

98. Conductors will be allowed to lay off on account of sickness of themselves or their families, to serve on committees, or for other good and sufficient reasons, provided due notice is given the proper officer.

**SENIORITY RIGHTS OF CONDUCTORS LAYING OFF. REPORTING FOR DUTY SUBSEQUENT TO LAY-OFF.**

99. Conductors temporarily laid off or laying off, will not be assigned to runs, but on return to service will be permitted to take any run to which they may be entitled, which has become vacant or which has been bulletined during their absence. Conductors in service three days during the period an assignment is under bulletin and not making application therefor under provisions of the bulletin will not be permitted to displace a junior conductor assigned thereto under provisions thereof. While laying off, they will not be considered in the service until return of their assignment, except they may report for service on their assignment. Conductors on regular assignments will be required to report for duty not less than four hours prior to leaving time of their assignment and in pool freight service, prior to time other conductors are called for service, and failing to comply with the above will not be permitted to go out on that trip.

**SERVICE LETTERS.**

100. When conductors leave the service, they will, if desired, be furnished a letter stating the length and class of service performed.

62

him to. An engineer who takes a run which has been bulletined on account of a temporary vacancy, pending the regular assigned man's return after leave of absence, shall not be permitted to displace such regular man whose run he has thus been given temporarily. However, upon the return of the regular man to service, the engineer who held the run on account of the temporary vacancy may displace any other junior man. Runs bulletined on account of temporary vacancy pending return of regular assignee shall be rebulletined if such assignee leaves the run or service permanently.

63. (d) A regularly assigned engineer will be permitted to relinquish his assignment after he has been on same ten days, and will be given a place on the extra list, provided there is a junior man thereon, but cannot displace other regularly assigned men, except as otherwise provided.

## LEAVE OF ABSENCE

64. (a) Master Mechanics may grant leave of absence for a period not exceeding sixty days. If a longer leave of absence is asked for, the master mechanic must submit it to the Chief Mechanical Officer for his approval, and that proper record may be made.

An engineer having been absent of his own accord to exceed six consecutive months, thereby forfeits all rights with the Railway, except when leave of absence has been granted in accordance with the rules. No leave of absence will be granted to exceed one year, except in case of sickness, or when serving as Chairman of General Committee.

144

Engineers must not engage in other business while on leave of absence, without permission from the Officer in Charge of Personnel.

## BULLETINED RUNS
### ABSENTEES NOT ELIGIBLE

64. (b) Engineers who are absent will not be assigned to runs.

Engineers returning to service after an absence of five consecutive days or more will be permitted to take any run to which they may be entitled, which has been bulletined and assigned during their absence. Engineers making application for bulletined runs prior to laying off will be assigned to said runs upon resuming duty. (See Circular S-1-241 of February 27, 1945, page 226 .)

Note: When there are no applicants for bulletined runs for engineers, the junior eligible engineer will be assigned thereto without respect to rule 64(b), even though he may be laying off, unless, of course, he is laying off thirty days or more, in which event the run will have to be rebulletined under provisions of rule 65(b).

64. (c) In the appointment of road foremen of engines, engineers will be given due consideration.

## ASSIGNMENT OF RUNS

65. (a) All new or vacant runs will be promptly bulletined for ten days and open to all that are eligible except as modified under provisions of rule 76.

145

### Article XIV — Joint Labor-Management Committee on Physical Disqualification Procedures

Within sixty (60) days of the date of this agreement, a committee, consisting of two partisan members representing the carriers and two partisan members representing the United Transportation Union, will be established to continue study and formulation of procedure covering physical disqualifications.

### Article XV — Joint Labor-Management Committee on Discipline Rules and Procedures

Within sixty (60) days of the date of this agreement, a committee, consisting of two partisan members representing the carriers and two partisan members representing the United Transportation Union, will be established for the purpose of continuing study and formulation of standard discipline rules and procedures. The signatories to this agreement will urge that the Committee's recommendations be adopted by the railroads parties hereto.

### Article XVI — General Provisions

#### Section 1. Court Approval

This Agreement is subject to approval of the courts with respect to participating carriers in the hands of receivers or trustees.

#### Section 2. Effect of this Agreement

(a) The purpose of this Agreement is to fix the general level of compensation during the period of the Agreement, and is in settlement of the dispute growing out of the notices served upon the carriers listed in Exhibit A by the Organization signatory hereto dated on or about January 3, 1977 and July 19, 1977 (wage and rules); February 15, 1977 and August 1, 1977 (health and welfare and dental), and proposals served on June 13, 1977 by the carriers for concurrent handling therewith.

(b) This Agreement shall be construed as a separate agreement by and on behalf of each of said carriers and their employes represented by the Organization signatory hereto, and shall remain in effect through March 31, 1981 and thereafter until changed or modified in accordance with the provisions of the Railway Labor Act, as amended.

(c) Except as provided by paragraph (d) of this Section 2, the parties to this Agreement shall not serve nor progress prior to January 1, 1981 (not to become effective before April 1, 1981) any notice or proposal for changing any matter contained in:

(1) this Agreement,

(2) Section 2(c) of Article XV of the Agreement of January 27, 1972, and

(3) proposals of the parties identified in Section 2(a) of this Article except proposal B of the carrier's June 13, 1977 notice.

and any pending notices which propose such matters are hereby withdrawn.

(d) Pending notices properly served under the Railway Labor Act covering subject matters not specifically dealt with in Section 2(c) of this Article XVI and which do not request compensation need not be withdrawn and may be progressed under the provisions of the Railway Labor Act, as amended. Similarly, new proposals properly served under the Railway Labor Act covering subject matters not specifically dealt with in Section 2(c) of this Article XVI and which do not request compensation may be served and progressed under the provisions of the Railway Labor Act, as amended.

(e) This Article will not bar management and committees on individual railroads from agreeing upon any subject of mutual interest.

Chicago and North Western
Transportation Company



One NorthWestern Center
Chicago, Illinois 60606

Labor Relations Department

December 13, 1991


Mr. D. F. Markgraf
7420 W. State Street
Wauwatosa, WI 53213


Reference:   Side Letter No. 11
             ------------------


Dear Mr. Markgraf:

This refers to our discussion regarding the implementation and application of the Crew Consist Agreement effective December 13, 1991.

(A) (1) There are presently employees out of service for disciplinary reasons. Should these employees return to service, they will be added to the total number of working employees for Reserve Board purposes. An employee in a dismissed status as of effective date of this agreement who is subsequently reinstated with seniority rights unimpaired shall also be eligible to apply for the separation allowance.

(2) There are presently employees on "Leave of Absence" for medical reasons. Should these employees return to service after successfully passing the Carrier's medical examination, they will be added to the total number of working employees for Reserve Board purposes. If there are employees on the Reserve Board in the returning employee's seniority district and if the number of buyouts has not exceeded the number of positions eliminated, the employee will be eligible to apply for the separation allowance so long as that employee is able to meet the physical and book of rules qualifications of employees in active service.

Should employees under this Letter's Item "A" return to service, they shall become eligible for the signing bonuses.

(3) There are presently employees on "Leave of Absence" for personal reasons. Ten (10) days prior to the effective date of this Agreement, such personal leaves of absence will be cancelled. These employees will have an opportunity to return to service in accord with this Agreement and be eligible for separation allowance.

Mr. D. F. Markgraf
December 13, 1991
Page 2


(B)  (1)  There are presently employees working as a Carrier officer, yardmaster
          or in engine service.  Should these employees return to trainman or
          yardman service, they will be added to the total number of working
          employees for Reserve Board purposes.

     (2)  Should employees under this Letter return to trainman or yardman
          positions, they shall become eligible for a Reserve Board position
          through the exercise of seniority, they must work at the location of
          the Reserve Board for a minimum of thirty (30) days, seniority
          permitting, prior to being assigned.



                              Yours truly,



                              J. M. Raaz
                              Assistant Vice President –
                              Labor Relations (Operating)


I CONCUR

D. F. Markgraf
General Chairman - UTU

Date: December 13 1991



lr/p33-8 (11)

**AUGUST 1, 1967**

**APPENDIX No. 15**
**Physical Examination Procedures**
**LR 011-3-4**
**ODO-2500**

**A G R E E M E N T**

*between the*

**UNION PACIFIC RAILROAD COMPANY**
*(northwestern District-Oregon Division*
*and the*

**BROTHERHOOD OF RAILROAD TRAINMEN**

**PHYSICAL QUALIFICATIONS - PROCEDURES**

**IT IS AGREED:**

**Sect ion 1.** Effective August 1, 1967, the following regulations are adopted as a provision of Agreement between the Company and the Organization:

(a) If a trainman considers himself physically qualified and protests suspension from service or change of occupation on that account, he or the general chairman in his behalf may discuss the case with the general manager who will review the report of the examining physician, and where, in his opinion, it is necessary, arrange for examination by an appropriate specialist.

The general manager will, on request, arrange for a joint conference with the general chairman and examining physician or specialist. The trainman will attend for personal observation if desired. If the general manager decides that the trainman cannot with safety be retained in the service, the trainman or the chairman will be so advised.

(b) If the trainman or chairman is not satisfied with the decision the general manager will, on request, arrange for examination of the trainman by a special medical board in accordance with a written agreement which will provide that:

(1) The medical board shall be comprised of three physicians, graduates of a Class A medical school, of at least five years' medical practice, and good professional reputation in the community. The Company will select one member, the trainmen will select one member, and the two thus selected will select a third member to be agreed upon by them.

(2) The trainman shall submit himself to this board for physical examination.

(3) The medical board will render a joint report of their findings and decision within fifteen days after examination of the trainman. One copy of the report will be transmitted to the general manager, one copy to the general chairman and one copy to the trainman.

(4) The findings of the board as to physical qualifications will be limited to a determination of whether the trainman is qualified to meet the physical requirements of the Company for employees of his occupation as prescribed in currently effective rules and instructions of the operating department governing the physical qualification of trainmen.

(5) Findings and decision of a majority of this board shall be final and binding upon the Company and the trainman; and the trainman shall not be considered eligible for employment by the Company unless a majority of the board shall have rendered decision declaring him physically qualified under the physical qualification rules of the Company.

**NOTE:** The provisions of this subparagraph (b)-5 shall be subject to the conditions and limitations specified in paragraph (e) of Section 1 of this Agreement as to subsequent reexamination.

(6) Where claim is made for reimbursement of trainman for time lost, the board will, in cases where the contention of the trainman is sustained, indicate date as of which, in its opinion, the trainman had recovered sufficiently to resume work in his regular occupation and trainman will be reimbursed for time lost from that date.

(7) The Company and the trainman will each pay the fee and personal expenses of their respective representatives on the board, and wi1 l each pay half the fee and personal expenses of the third member as well as half of all additional expenses incurred by the board in connection with the examination.

(c) <u>Vision and Hearing - Field Test.</u> Where an indoor test discloses -deficiency of vision, color perception or hearing, the trainman will, on request, be granted a field test, the result of which will govern his qualification. In case of failure to pass the test when examined without glasses, and further examination shows that with glasses the test can be met satisfactorily, the acceptance of the trainman examined will be optional.

(d) <u>Physical Examination.</u> No compensation will be paid or claim presented for time lost in taking periodical physical examinations or additional scheduled examinations as may be prescribed in connection with physical deficiencies requiring observation or treatment between the usual periodical examinations, but employees required to submit to physical examination other than periodical examinations or scheduled examinations as above described will be reimbursed for time lost, if any, and, if examination is conducted on layover day, they will be paid a minimum day at the rate of the service in which they were engaged at the time they were required to take the examination. Periodical examinations will be conducted at nearest point a qualified doctor designated in time table is available.

**Note:** General Managers will handle each individual case between trainmen with impaired hearing upon its own merits and where a trainman with impaired hearing can meet physical requirements and pass satisfactory field test by using hearing aid, each case will be given full consideration with respect to his continuing in service.

(e) Should the decision of the board of physicians as referred to in paragraph (b) of this Agreement be adverse to the employee and he considers that his physical condition has improved sufficiently to justify considering his return to service, a reexamination will be arranged upon request of the employee, or his representative (Genera) Chairman) but not earlier than nine (9) months after the first of such decisions and with the further understanding that disqualification on the third re-examination, which shall not be earlier than nine (9) months from the second re-examination, by the Medical Board shall in that event be final and binding and no further requests for re-examination shall be made and no further reexamination shall be given.

**Section 2.** The provisions of Section 1and paragraphs (a) through (e) thereof shall also apply to trainmen while employed and working as yardmen on yard service assignments.

**Section 3.** This Agreement shall be effective August 1, 1967, and thereafter, subject to change or termination as provided in the Railway Labor Act, as amended.

**Dated and signed at Portland, Oregon this 19th day of July, 1967.**

BROTHERHOOD OF UNION PACIFIC RAILROAD

RAILROAD TRAINMEN: COMPANY:

*S/ J. H. Watson S/ N. B. Beckley*

General Chairman Assistant to Vice

President



International Association of Sheet Metal, Air, Rail and Transportation Workers

# SMART

## Transportation Division

October 12, 2021

Mr. Rod Doerr
Vice President - Labor Relations
Union Pacific Railroad Company
1400 Douglas Street, Stop 710
Omaha, NE  68179-0710

Dear Mr. Doerr:

This is to advise that the Organization strongly disagrees with Carrier's action to unilaterally require a vaccination as a condition of employment.  We understand that OSHA has issued a Federal requirement (September 24, 2021), but Carrier has created new working conditions without negotiations with the Organization. We also recognize the seriousness of the pandemic, but such does not permit Carrier to institute an arbitrary policy, which will have a sweeping effect on the current working conditions at Union Pacific Railroad, rather than negotiate an agreement.

As the parties are currently in Section 6 bargaining, Carrier is required to maintain the status quo.  This sweeping change to the current working conditions does not meet the standards as contained in the Railway Labor Act.  The Act mandates that "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice."

Until Carrier meets with the Organization to negotiate in good faith, the Organization vehemently opposes any change to the requirements for employment by the members represented by SMART-TD.

By what authority does Carrier purport to act?  Given the seriousness of this matter, please respond immediately in writing.  The Organization also demands an immediate meeting regarding this matter, since the Railway Labor Act places an affirmative duty on the parties to "make and maintain agreements." Please advise when you can meet to discuss this important issue.

Finally, be advised that if Carrier unwisely decides to continue this or similar activities, this Organization will exercise its full rights under the law.

Sincerely,

*Roy Davis*

Roy Davis
General Chairperson
GO-577

*Luke Edington*

Luke Edington
General Chairperson
GO-953

*Scott Chelette*

Scott Chelette
General Chairperson
GO-927

*Terry Dixon*

Terry Dixon
General Chairperson
GO-569

Ex. 8





International Association of Sheet Metal, Air, Rail and Transportation Workers

**Transportation Division**

October 14, 2021

Mr. Rod Doerr
Vice President - Labor Relations
Union Pacific Railroad Company
1400 Douglas Street, Stop 710
Omaha, NE  68179-0710

Dear Mr. Doerr:

   This is reference to our letter dated October 12, 2021, regarding Carrier's unilateral action to require a vaccination as a condition of employment rather than negotiate an agreement. Carrier has yet to respond or schedule a meeting between the parties as requested.

   The Organization demands that Carrier treat this issue with utmost importance as it affects thousands of employees and their families.  Please respond immediately in writing and advise when you can meet to discuss this issue.

                    Sincerely,

*Roy Davis*                              *Luke Edington*

Roy Davis                                Luke Edington
General Chairperson                      General Chairperson
GO-577                                   GO-953


*Scott Chelette*                         *Terry Dixon*

Scott Chelette                           Terry Dixon
General Chairperson                      General Chairperson
GO-927                                   GO-569

Ex. 9



October 15, 2021

Gentlemen:

I am writing in response to your October 12, 2021, and follow-up letter of October 14, 2021, concerning COVID-19 vaccine mandates. As you are aware, President Biden issued Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, on September 9, 2021. Executive Order 14042 requires federal contractors and subcontractors to follow COVID-19 protocols established by The Safer Federal Workforce Task Force (Task Force). On September 24, the Task Force issued *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (Guidance). The Guidance requires employees of federal contractors and subcontractors to be fully vaccinated by December 8, 2021, unless they are legally entitled to an accommodation.

Union Pacific has a long and proud history serving the United States government. Union Pacific is and will continue to be a government contractor by contracting with, among other agencies, the Departments of Defense and Energy. Additionally, Union Pacific serves numerous clients that contract with the federal government, imposing federal subcontract obligations on us as well. Accordingly, Union Pacific will endeavor to comply with our legal obligations under Executive Order 14042. We expect full support and cooperation of the unions, including the SMART-TD, that represent our employees.

To the extent you have any concerns about the vaccine mandate, we encourage you to raise them with your Union's General Council and National Leadership along with your representatives in Washington, D.C.

Information about our compliance with Executive Order 14042 and the Guidance has been presented to our employees by various communication means on October 11th with further updates as more is known.

I look forward to your ministration as we continue to remediate the effects of COVID-19 on our workforce.

Sincerely,

Rod Doerr
VP Labor Relations
Union Pacific Railroad

Ex. 10

**UNION PACIFIC RAILROAD**
1400 Douglas Street, 3rd Floor
Omaha, Nebraska 68179

**Rod Doerr**
Vice President -
Labor Relations

P  402-544-6302
E  rndoerr@up.com